**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OPEN SOCIETY JUSTICE INITIATIVE
224 West 57th Street
New York, NY 10019;

DIANE MARIE AMANN
889 Hill Street
Athens, GA 30606;

MILENA STERIO
23325 Hardwick Road,
Shaker Heights, OH 44122;

MARGARET DEGUZMAN
6923 Greene Street,
Philadelphia, PA 19119; and

GABOR RONA
230 Marlborough Street,
Boston, MA 02116,

          Plaintiffs,

   v.

DONALD J. TRUMP, President of the United
States
1600 Pennsylvania Ave., N.W.
Washington, D.C. 20500;

UNITED STATES DEPARTMENT OF
STATE
2201 C St., N.W.
Washington, D.C. 20520;

MICHAEL R. POMPEO, Secretary of State
2201 C St., N.W.
Washington, D.C. 20520;

UNITED STATES DEPARTMENT OF THE
TREASURY
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220;

Civil Action No. _____

STEVEN T. MNUCHIN, Secretary of the
Treasury
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220;

UNITED STATES DEPARTMENT OF
JUSTICE
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530;

WILLIAM P. BARR, United States Attorney
General
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530;

OFFICE OF FOREIGN ASSETS CONTROL
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220; and

ANDREA M. GACKI, Director of the Office
of Foreign Assets Control
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220,

                    Defendants.

## **COMPLAINT**

### **INTRODUCTION**

1.      Plaintiffs, a public interest law center and four distinguished law professors, bring this action to challenge the lawfulness of Executive Order 13,928, *Blocking Property of Certain Persons Associated With the International Criminal Court* (the "Executive Order"), issued by President Donald J. Trump on June 11, 2020, and its implementing regulations, 31 C.F.R. §§ 520.101 *et seq.* (the "Regulations"), issued by the Office of Foreign Assets Control ("OFAC") on September 30, 2020.

2

2.     The Executive Order empowers the Secretary of State to designate foreign persons determined to have engaged in or assisted efforts by the International Criminal Court ("ICC" or the "Court") to investigate or prosecute international crimes allegedly committed by Americans or personnel of certain United States allies, or to have assisted, supported, or provided services to or in support of designated persons.  Engaging in prohibited interactions with a designated person is unlawful and subjects those who do so to civil and criminal fines, and, if a natural person, 20 years' incarceration, under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq*.  Such interactions also subject persons to being themselves designated under the Executive Order.

3.     In the past, Plaintiffs have engaged with the ICC, including in its investigations and prosecutions, and Plaintiffs had intended to engage with it in the future.  Plaintiffs also regularly assisted the individuals currently designated under the Executive Order—two high-ranking officials within the Court's Office of the Prosecutor—by educating, training, or advising them and members of their Office, and by undertaking public advocacy in support of their mission and work. The Executive Order and the Regulations have injured Plaintiffs by prohibiting them from continuing such education, training, advice, or advocacy.

4.     The Executive Order and the Regulations impermissibly restrict Plaintiffs' First Amendment rights to freedom of speech by prohibiting them from providing the speech-based services and assistance described above, including with respect to ICC investigations and prosecutions that the United States supports.  The Executive Order and the Regulations also lack the clarity required by the Fifth Amendment as to which acts subject a person to enforcement or designation, or which persons they cover.  Finally, the Executive Order and the Regulations are

*ultra vires* under IEEPA, their governing statute, because they purport to regulate and prohibit Plaintiffs' provision of information and informational materials despite the statute's express exemption protecting such activity.  Accordingly, Plaintiffs seek a declaration that the Executive Order and the Regulations violate the First and Fifth Amendments to the U.S. Constitution and are *ultra vires* under IEEPA.  Plaintiffs also seek an order enjoining Defendants from enforcing IEEPA's civil and criminal penalties against them or designating them under the Executive Order.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 28 U.S.C. §§ 2201–2202, and 5 U.S.C. § 706.

6.      The Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; 5 U.S.C. § 702; and the Court's inherent equitable powers.

7.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (e)(1).  Plaintiff Open Society Justice Initiative's principal place of business is in this District.

## PARTIES

8.      Plaintiff Open Society Justice Initiative ("OSJI"), a program of the Open Society Institute, is a public interest law center dedicated to upholding human rights and the rule of law through litigation, advocacy, research, and technical assistance.  The Open Society Institute is a tax-exempt, non-partisan, not-for-profit organization headquartered in New York, New York, which is a member of the Open Society Foundations, a global network of independent legal entities that have chosen to maximize their effectiveness by working together towards a common mission.

OSJI undertakes legal work in a range of thematic areas including international justice in a variety of locations outside the United States.

9.      Plaintiff Diane Marie Amann is the Emily and Ernest Woodruff Chair in International Law and Faculty Co-Director of the Dean Rusk International Law Center at the University of Georgia School of Law.  In 2012, she was appointed Special Adviser to the Prosecutor of the International Criminal Court on Children in and affected by Armed Conflict. Plaintiff Amann resides in Georgia and is a citizen of the United States and Ireland.

10.      Plaintiff Milena Sterio is the Charles R. Emrick Jr. – Calfee Halter & Griswold Professor of Law at the Cleveland-Marshall College of Law.  Plaintiff Sterio resides in Ohio and is a citizen of the United States and Serbia.

11.      Plaintiff Margaret deGuzman is a James E. Beasley Professor of Law and Co-Director of the Institute for International Law and Public Policy at Temple University's Beasley School of Law.  Plaintiff deGuzman resides in Pennsylvania and is a citizen of the United States and Canada.

12.      Plaintiff Gabor Rona is Professor of Practice at Cardozo School of Law and Director of the Law and Armed Conflict Project at the Cardozo Law Institute in Holocaust and Human Rights.  Plaintiff Rona resides in Massachusetts and is a citizen of the United States and Hungary.

13.      Plaintiffs Amann, Sterio, deGuzman, and Rona are suing in their personal capacities and not in connection with their universities or any other institutions.

14.      Defendant Donald J. Trump is President of the United States and is sued in his official capacity.

15.     Defendant Department of State is a United States agency headquartered in Washington, D.C.

16.     Defendant Michael R. Pompeo is the United States Secretary of State and is sued in his official capacity.

17.     Defendant Department of the Treasury is a United States agency headquartered in Washington, D.C.

18.     Defendant Steven T. Mnuchin is the United States Secretary of the Treasury and is sued in his official capacity.

19.     Defendant Department of Justice is a United States agency headquartered in Washington, D.C.

20.     Defendant William P. Barr is the United States Attorney General and is sued in his official capacity.

21.     Defendant Office of Foreign Assets Control is a United States agency headquartered in Washington, D.C.

22.     Defendant Andrea M. Gacki is the Director of the Office of Foreign Assets Control and is sued in her official capacity.

## FACTUAL ALLEGATIONS

### The ICC and its Office of the Prosecutor

23.     The ICC is a permanent court, based in The Hague, the Netherlands, which began operations in 2002.  It was created by the 1998 Rome Statute of the International Criminal Court (the "Rome Statute"), a treaty that currently has 123 States Parties from every region of the world.

24.     Pursuant to the terms of the Rome Statute, the ICC may exercise jurisdiction over the investigation, prosecution, and punishment of individuals accused of serious crimes, including war crimes, crimes against humanity, and genocide.

25.     States that ratify or accede to the Rome Statute consent to the ICC's investigation, prosecution, and punishment of international crimes within the Court's jurisdiction that are alleged to have occurred on States Parties' territory or by their nationals.

26.     The ICC may also investigate and prosecute international crimes falling under its jurisdiction where the United Nations Security Council refers the situation to the Court.  The United States voted in favor of such a referral by the Security Council with regard to the situation in Libya, and supported such a referral with regard to the situation in the Darfur region of Sudan.

27.     The ICC has no independent enforcement power and relies upon States to arrest individuals who are subject to arrest warrants issued by the Court.

28.     The Office of the Prosecutor is one of four "organs" that comprise the ICC, and is responsible for examining situations where international crimes under the jurisdiction of the Court are alleged to have been committed, carrying out investigations of such situations, and prosecuting individuals who are allegedly responsible for those crimes.

29.     Ms. Fatou Bensouda is the Prosecutor of the ICC and the head of the Office of the Prosecutor.  She has served as the Prosecutor of the ICC since 2012, after her unanimous election to that position by the States Parties to the Rome Statute.

30.     Mr. Phakiso Mochochoko is the head of the Office of the Prosecutor's Jurisdiction, Complementarity and Cooperation Division.  He has served in that position since 2011.

31.     Investigations and prosecutions of international crimes within the jurisdiction of the Court include the following:

    a.   In April 2004, the Government of the Democratic Republic of the Congo (a State Party to the Rome Statute) referred to the ICC alleged war crimes and crimes against humanity, including recruiting child soldiers, rape, and murder, occurring in its territory since it ratified the Rome Statute in April 2002.  In June 2004, the Office of the Prosecutor opened an investigation into these alleged crimes.  One of the defendants was Bosco Ntaganda, who surrendered himself to the ICC in March 2013.

    b.   In March 2013, the Department of State stated that it "welcome[d] the removal of one of the most notorious and brutal rebels in the Democratic Republic of the Congo, Bosco Ntaganda, … to the International Criminal Court."   In November 2013, the Department of State stated that the United States had "played a key role in the surrender of Bosco Ntaganda to the ICC."

    c.   In December 2004, the Government of the Central African Republic (a State Party to the Rome Statute) referred to the ICC alleged international crimes occurring in its territory during an armed conflict between 2002 and 2003.  In May 2007, the Office of the Prosecutor opened an investigation into alleged war crimes and crimes against humanity committed during that conflict, including mass rapes and killings.  In May 2014, the Government of the Central African Republic further referred the situation regarding the conflict occurring in its territory since August 2014 to the ICC. Ms. Bensouda opened an

8

investigation in September 2014 into alleged war crimes and crimes against humanity committed during the conflict that led to thousands of deaths and left hundreds of thousands displaced.

d.   In January 2015, the Department of State stated that "[t]he United States welcomes the transfer … by Central African authorities to the International Criminal Court" of a defendant who is currently standing trial before the Court.

e.   In March 2016, the Department of State expressed the United States' support for "the ICC's investigations in the Central African Republic [(CAR)]" and stated that "we commend CAR's commitment to ensuring accountability for serious crimes, including through its cooperation with the ICC in this matter as well as through domestic efforts to pursue justice."

f.   In March 2005, the United Nations Security Council, of which the United States is one of five permanent members, referred the situation in Darfur in Sudan (which not a State Party to the Rome Statute) to the ICC.  In June 2005, the Office of the Prosecutor opened an investigation into alleged genocide, war crimes, and crimes against humanity committed in Darfur.

g.   In 2007, a spokesperson for the Department of State stated that the United States "fully support[s] bringing to justice those responsible for crimes and atrocities … that have occurred in Darfur.  We are at a point in the process now where we would call upon the Sudanese Government to cooperate fully with the ICC under the aegis of UN Security Council Resolution 1593.  So it is now

incumbent upon the Government of Sudan, we believe, to cooperate with the ICC."

h. In February 2011, the United Nations Security Council referred the situation in Libya (which is not a State Party to the Rome Statute) to the ICC. In March 2011, the Office of the Prosecutor opened an investigation into Libyan security forces' alleged widespread and systematic attacks—including killings and disappearances—against the civilian population during an internal armed conflict, which could constitute war crimes and crimes against humanity.

i. Speaking on the occasion of the decision of the United Nations Security Council to refer the situation to the ICC, the U.S. Ambassador to the United Nations stated: "[T]he Security Council has responded to the Libyan people's cry for help. The Council's purpose is clear—to protect innocent civilians. On 26 February [2011], acting under Chapter VII of the United Nations Charter, the Security Council demanded a halt to the violence in Libya and enabled genuine accountability for war crimes and crimes against humanity by referring the situation to the International Criminal Court."

j. In a subsequent United Nations Security Council session, the United States stated that the referral to the ICC by "the Council reflected the importance that the international community attaches to ensuring that those responsible for the widespread and systematic attacks against the Libyan people are held accountable" and commended the Office of the Prosecutor, stating that the United States "welcomes the swift and thorough work of the Prosecutor.… The

spectre of ICC prosecution is serious and imminent, and should serve as a warning to those around [former Libyan leader Muammar] Al-Qadhafi of the perils of continuing to tie their fate to his."

k.  In July 2012, the Government of Mali (which is a State Party to the Rome Statute) referred the situation regarding alleged international crimes occurring during the armed conflict in its territory to the ICC.  In January 2013, the Office of the Prosecutor opened an investigation into alleged war crimes committed in Mali since January 2012, including in regard to the destruction of cultural heritage sites in the city of Timbuktu.

l.  In October 2015, the Department of State stated: "We welcome the announcement by the Prosecutor of the International Criminal Court (ICC) that Ahmad Al Faqi Al Mahdi … has been surrendered to the Court by Nigerien authorities. This is an important step toward holding accountable those responsible for serious crimes in Mali."  The Department of State further stated: "The United States strongly condemns the destruction of Muslim shrines and other religious and historic sites in Timbuktu by extremist militants …. We are outraged by the destruction of these World Heritage Sites.  These are assaults not just on Mali and its people, but on the common cultural heritage of all humankind, and those responsible for these acts—and all those responsible for atrocity crimes—should face justice. …  We commend Mali's commitment to ensuring accountability for serious crimes and its cooperation with the ICC in this matter."

11

m.  In September 2016, the Department of State stated: "The United States supports efforts by the ICC and Malian authorities to provide justice for these serious crimes committed in Mali.  We commend Mali for its cooperation with the ICC in this matter, and we encourage continued national and international efforts to bring to justice senior extremist leaders who led the campaign to terrorize northern Mali and destroy symbols of its rich history of tolerance and cultural pluralism."

n.  In May 2018, the Government of the State of Palestine (which is a State Party to the Rome Statute) referred the situation in Palestine to the Office of the Prosecutor, to investigate alleged crimes committed on that territory since June 2014.  This referral did not automatically lead to the opening of an investigation. In December 2019, Ms. Bensouda sought a ruling from the Pre-Trial Chamber of the ICC as to the scope of jurisdiction of the ICC.  That request is pending as of the date of filing of this complaint.

o.  In March 2020, the ICC's Appeals Chamber authorized Ms. Bensouda to open an investigation into crimes allegedly committed in Afghanistan since 2003, including crimes allegedly committed by the Taliban, Afghan security forces, and U.S. personnel in Afghanistan (which is a State Party to the Rome Statute), and on the territory of other ICC States Parties.

**Plaintiffs' Interactions with and Concerning the ICC and its Office of the Prosecutor**

32.  As set out below, Plaintiffs have had substantial interactions with the ICC, including with Ms. Bensouda and Mr. Mochochoko.

*Open Society Justice Initiative*

33.     OSJI has a longstanding commitment to international justice.  Where genuine efforts toward accountability for the commission of war crimes, crimes against humanity, and genocide are not taking place, OSJI has supported the ICC's mission to investigate and prosecute those individuals alleged to be most responsible for these crimes.  OSJI's activities toward this end include:

a.  In 2013, OSJI provided technical assistance to the ICC's Office of the Prosecutor to help improve its prosecutorial strategies by co-convening, together with the Office of the Prosecutor, a meeting attended by Ms. Bensouda and Mr. Mochochoko, among other ICC staff.  These acts occurred in New York and the Netherlands.

b.  Between 2013 and 2015, OSJI assisted the Office of the Prosecutor in ascertaining how the Office might utilize emerging technologies to analyze evidence of international crimes, including by bringing together experts in the fields of information technology and forensics with staff from the Office of the Prosecutor and supporting the establishment and operationalization of a technical advisory board. These acts occurred in New York and the Netherlands.

c.  In 2015, OSJI organized a workshop to educate Palestinian civil society about the ICC, including opportunities to support the Office of the Prosecutor with regard to the collection of evidence relating to alleged international crimes committed in Palestine.  These acts occurred in Ramallah, Palestine.

13

d.  In 2017, OSJI met with ICC staff, including from the Office of the Prosecutor, to assist in improving the Court's communications with a view to strengthening its effectiveness and public support.  These acts occurred in New York, the Netherlands, and the United Kingdom.

e.  In March 2020, OSJI co-organized a workshop, attended by staff of the Office of the Prosecutor, which addressed strategies for improving the performance of the Office, including with respect to investigations and prosecutions, with the aim of contributing to an external review of the Court being conducted by States Parties.  These acts occurred online due to travel restrictions related to the COVID-19 pandemic.

f.  Between 2017 and 2020, OSJI conducted educational sessions for civil society groups regarding the ICC and opportunities for participation in ICC investigations.  These acts occurred in various countries.

g.  Over the last ten years, OSJI has met with members of the Office of the Prosecutor approximately 5-15 times per year.  Those meetings have concerned: efforts to ensure that local civil society's views about and documentation of crimes are considered in the Office of the Prosecutor's preliminary examinations and investigations; consultations on the Office of the Prosecutor's policies (such as the policy on case selection and prioritization and the policy on prosecution of sexual and gender-based crimes); semi-public information sessions (such as on the status of preliminary examinations); and

14

periodic meetings with ICC staff organized under the umbrella of the non-governmental organization Coalition for the ICC.

h.   Since 2015, OSJI has held approximately 2-4 meetings or telephone calls per year with Ms. Bensouda to discuss civil society concerns and other issues relating to the work of the Office of the Prosecutor.

i.   OSJI has attended conferences, meetings, and events where Office of the Prosecutor staff have been present, including, for example, during the annual ICC Assembly of States Parties' ordinary sessions and gatherings of its subsidiary bodies.

*Diane Marie Amann*

34.   On December 12, 2012, Plaintiff Amann was appointed by Ms. Bensouda to be the first-ever Special Adviser to the ICC Prosecutor on Children in and affected by Armed Conflict ("Special Adviser").  The appointment was made pursuant to Article 42(9) of the Rome Statute, which states: "The Prosecutor shall appoint advisers with legal expertise on specific issues, including, but not limited to, sexual and gender violence and violence against children."  The press release announcing her appointment stated that she "will support and advise on policies and training or awareness with regard to children in and affected by armed conflict."

35.   Plaintiff Amann accepted the appointment of Special Adviser in her personal capacity, and not as a representative of her university or any other institution.

36.   A principal responsibility that Plaintiff Amann undertook as Special Adviser was to assist Office of the Prosecutor staff members in research, consultations, drafting, editing, and publication of the ICC Office of the Prosecutor *Policy on Children*.  Leaders of that effort, with

15

whom Plaintiff Amann worked closely, included the heads of both the Legal Advisory Section and the Gender and Child Unit of the Office of the Prosecutor.  The stated objectives of the *Policy on Children*, which was published in November 2016, include: "affirm[ing] the commitment of the Office to pay particular attention to crimes against or affecting children" and "[p]rovid[ing] clarity and direction to staff in the interpretation and application of the [Rome] Statute and the Rules [of Procedure and Evidence and Elements of Crimes], at all stages of the Office's work, in order to effectively address crimes against or affecting children."  The *Policy on Children* applies to all ICC examinations, investigations, and prosecutions.  Plaintiff Amann and Ms. Bensouda both made public presentations at a November 2016 event that launched the *Policy on Children*.

37.     Plaintiff Amann provided advice to Ms. Bensouda and the Office of the Prosecutor through trainings, conferences, and other events on a range of topics including, but not limited to, the *Policy on Children*.

38.     Plaintiff Amann has participated in numerous expert roundtables and other consultations with Office of the Prosecutor staff.

39.     Plaintiff Amann's most recent publication, "The Policy on Children of the ICC Office of the Prosecutor: Towards Greater Accountability for Crimes against and affecting Children," published in 2020 in an *International Review of the Red Cross* special issue on war and children, criticized a ruling by ICC judges that had rejected "the prosecutor's 2017 request to open an investigation into conduct in Afghanistan … by members of armed groups like the Taliban and of the armed forces of Afghanistan and the United States," on the ground that the ruling had "the effect of precluding an ICC prosecution for harms that children have suffered during the protracted conflict in Afghanistan."

16

40.     Since 2012, Plaintiff Amann has worked with student research assistants to examine legal instruments, doctrines, reports, and opinions regarding international criminal law, children and armed conflict, and child rights.  Plaintiff Amann has utilized this research to enable her to provide advice to the Office of the Prosecutor in her role as Special Adviser, including in the drafting and editing, along with staff members of the Office of the Prosecutor, of the *Policy on Children*.

41.     Plaintiff Amann is a frequent contributor to influential international law outlets regarding issues relating to international criminal law and the work of Ms. Bensouda and the Office of the Prosecutor.

*Milena Sterio*

42.     Plaintiff Sterio has attended several conferences with Office of the Prosecutor staff over the past several years, in which her presentations have been directed at Office of the Prosecutor personnel as well as academic audiences.  In at least one such presentation, she advised that the ICC should investigate the situation in Afghanistan.

43.     Plaintiff Sterio has attended the ICC Scholars Forum in The Hague in 2018 and 2019, and for the past seven years, she has attended the annual International Humanitarian Law Dialogues in Chautauqua, New York, a conference attended by prosecutors from various international criminal courts and tribunals, including the ICC.

44.     Plaintiff Sterio has met and/or communicated with personnel in the Office of the Prosecutor in 2018 and in 2019, including during her visit to the ICC in June 2019.

45.     Since 2006, Plaintiff Sterio has taught a seminar entitled "International War Crimes," in which she supervises student research on various prosecutorial issues and strategies,

17

including on the ICC's investigation into the situation in Darfur. The memoranda produced from this seminar have been submitted to the prosecutorial offices of international criminal tribunals, including the ICC's Office of the Prosecutor.

46.     Since 2018, Plaintiff Sterio has served as Co-Chair of the Women in International Law Interest Group at the American Society of International Law. In this capacity, Plaintiff Sterio has interacted with Prosecutor Bensouda and other Office of the Prosecutor personnel.

47.     Plaintiff Sterio has submitted *amicus curiae* briefs to the ICC supportive of positions advanced by the Office of the Prosecutor.

48.     Plaintiff Sterio has published widely on the ICC in both academic and popular fora, where she has argued that the Afghanistan investigation fell within the ICC's jurisdictional mandate.

*Margaret deGuzman*

49.     Since 2009, Plaintiff deGuzman has regularly given presentations about the ICC, some of which have been attended by ICC staff, including Ms. Bensouda, Mr. Mochochoko, and others from the Office of the Prosecutor.

50.     Plaintiff deGuzman has submitted *amicus curiae* briefs to the ICC supportive of positions taken by the Office of the Prosecutor. In particular:

> a.  In 2013, Plaintiff deGuzman submitted an *amicus curiae* brief concerning the situation in Cote D'Ivoire and the definition of crimes against humanity.
>
> b.  In 2018, Plaintiff deGuzman submitted an *amicus curiae* brief concerning the situation in Darfur and the immunity of President Omar al-Bashir.

51.     Plaintiff deGuzman has met and communicated with personnel in the Office of the Prosecutor on many occasions, including during her visit to the ICC in June 2019.

52.     In May 2020, Plaintiff deGuzman's book, *Shocking the Conscience of Humanity: Gravity and the Legitimacy of International Criminal Law*, was published by Oxford University Press.  A primary objective of the book is to influence the prosecutorial strategies of the Office of the Prosecutor.  The book includes arguments against the ICC Pre-Trial Chamber's decision not to allow Ms. Bensouda to open an investigation into the Afghanistan situation.

53.     Plaintiff deGuzman has published articles, book chapters, and essays on the ICC that are intended to influence the prosecutorial strategies of the Office of the Prosecutor, including arguing that the Prosecutor should have broad discretion in deciding when to investigate and prosecute.  She has also stated her support for the Office of the Prosecutor in the media.

*Gabor Rona*

54.     Plaintiff Rona has lectured on the ICC at academic conferences and military trainings held worldwide, including in the United States.  From 1998 to 2005, he served as Legal Advisor in the Legal Division of the International Committee of the Red Cross and represented it in the negotiation of the Rome Statute's Rules of Procedure and Evidence.

55.     In 2019, Plaintiff Rona filed an *amicus curiae* brief in the ICC's Appeals Chamber concerning the exercise of the Court's jurisdiction in relation to alleged international crimes committed in connection with the armed conflict in Afghanistan.  Plaintiff Rona argued that the ICC has the authority to exercise jurisdiction over alleged crimes committed in relation to the situation in Afghanistan, but which occurred in third countries that are States Parties to the Rome Statute.

56.     Plaintiff Rona has made numerous presentations on the ICC's jurisdiction over such alleged crimes in academic panels, blogs, and lectures, some of which have contained similar themes to his *amicus curiae* brief, others of which have criticized the Executive Order.

57.     Since 2019, Plaintiff Rona has taught courses each academic semester on international law that include the topic of ICC jurisdiction over alleged war crimes committed in relation to the situation in Afghanistan.

## The International Emergency Economic Powers Act

58.     The Executive Order cites the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq*., as the basis for its authority.

59.     IEEPA grants the President certain powers once the President has declared a national emergency with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). When the President has declared such an emergency, the President may "block … regulate … void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, … dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B). However, the President may not "regulate or prohibit, directly or indirectly … any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value," or the importation or exportation of "any information or informational materials." 50 U.S.C. §§ 1702(b)(1) and (3).

60.     The President often exercises this authority under IEEPA by issuing an executive order forbidding the dealing in property or interests in property of certain persons, and authorizing federal agencies to "designate" those persons whose property or interests in property may not be dealt in.

61.     Designation results in the designated person's inclusion on the Specially Designated Nationals List maintained by OFAC, an office of the Department of the Treasury.

62.     Orders issued pursuant to IEEPA forbid "deal[ing] in" a designated person's "property or interests in property."  OFAC has interpreted these terms broadly, such that virtually any interaction with a designated person is forbidden.

63.     It is unlawful to violate an order issued under IEEPA.  50 U.S.C. § 1705(a).  Those who violate such orders are subject to a civil penalty of the greater of $307,922 or twice the value of the blocked transaction.  *See id*.; 31 C.F.R. § 520.701; 85 F.R. 19884 (2020).  They are also subject to criminal fines of up to $1,000,000 and, if a natural person, up to 20 years' imprisonment.

64.     Designation and enforcement of IEEPA's civil and criminal penalties are two distinct consequences under IEEPA.  Both deter persons, including financial institutions, from interacting with designated persons.

### The Executive Order and the Regulations

65.     On June 11, 2020, President Trump issued the Executive Order, declaring a national emergency in connection with ICC investigations that may implicate U.S. personnel or the personnel of certain U.S. allies.

66.     On September 30, 2020, OFAC issued the Regulations.

67.     Section 1(a)(i) of the Executive Order blocks and restricts transfer of the property and interests in property that are in the United States, or that come within the possession or control of any United States person, of any *foreign person* who is determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General:

> (A) to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States;

> (B) to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any personnel of a country that is an ally of the United States without the consent of that country's government;

> (C) to have *materially assisted*, sponsored, or provided financial, *material*, or technological support for, or goods or *services to or in support of*, any activity described in subsection (a)(i)(A) or (a)(i)(B) of this section or any person whose property and interests in property are blocked pursuant to this order; or

> (D) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

Executive Order, § 1(a)(i) (emphasis added).

68.     "Foreign person[s]" who perform acts described in Sections (1)(a)(i)(A)-(C) of the Executive Order are thus subject to designation.

69.     In particular, a "foreign person" may be designated for either:

   a.  Having "materially assisted, … provided … material … support for, or … services to or in support of, any person whose property and interests in property are blocked pursuant to this order;" (emphasis added) or

   b.  Having "materially assisted, … provided … material … support for, or … services to or in support of, any activity described in subsection (a)(i)(A) or (a)(i)(B)." These activities include the investigation or prosecution of

international crimes allegedly committed by Americans or personnel of certain United States allies.

70.     Violating the Executive Order by dealing with the property or interests in property of a person designated under the Executive Order may subject the violator to enforcement of civil and criminal enforcement under IEEPA, as described in paragraph 63.  The Regulations define "property or interests in property" to include "services of any nature whatsoever."  520 C.F.R. § 520.310.

71.     Foreign persons who interact with a designated person, such as by providing services to or in support of that person, material assistance, or material support, may therefore be subject to both designation under Section 1(a)(i)(C) of the Executive Order *and* enforcement of IEEPA's civil and criminal penalties.

72.     The Executive Order and the Regulations do not define the term "materially assisted."  Neither OFAC nor any of the Departments of the Treasury, State, or Justice (collectively, the "Departments") has issued regulations or guidance clarifying the meaning of "materially assisted" as used in the Executive Order.

73.     The Executive Order does not define the term "financial, material, or technological support."  The Regulations define "financial, material, or technological support" as "any property, tangible or intangible, including currency, financial instruments, securities, or any other transmission of value; weapons or related materiel; chemical or biological agents; explosives; false documentation or identification; communications equipment; computers; electronic or other devices or equipment; technologies; lodging; safe houses; facilities; vehicles or other means of transportation; or goods."  31 C.F.R. § 304.  Neither OFAC nor any of the Departments has issued

23

other regulations or guidance clarifying the meaning of "material …. support" as used in the Executive Order.

74.     The Executive Order and the Regulations do not define the term "services to or in support of."  Neither OFAC nor any of the Departments has issued regulations or guidance clarifying the meaning of "services to or in support of" as used in the Executive Order.

75.     The Executive Order and the Regulations do not define the term "foreign person." Neither OFAC nor any of the Departments has issued regulations or guidance clarifying the meaning of "foreign person" as used in the Executive Order.

76.     Other OFAC sanctions regimes contain varying definitions of "foreign person." For example, the Narcotics Trafficking Sanctions Regulations (the "Narcotics Regulations") define "foreign person" as "any citizen or national of a foreign state (including any such individual who is also a citizen or national of the United States), or any entity not organized solely under the laws of the United States or existing solely in the United States, but does not include a foreign state." 31 C.F.R. § 536.304.

77.     The North Korea Sanctions Regulations (the "North Korea Regulations") define "foreign person" as "any person that is not a U.S. person." 31 C.F.R. § 510.310.  The North Korea Regulations further define the term "U.S. person" as "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."  31 C.F.R. § 510.326.

78.     None of the Departments has issued regulations or guidance indicating which, if either, of the definitions of "foreign person" contained in the Narcotics Regulations or the North Korea Regulations applies to the Executive Order.

79.     The Regulations state that their prohibitions do not apply to "[p]ersonal communications."  31 C.F.R. § 520.205.

80.     The Regulations do not state that their prohibitions do not apply to information or informational materials.

81.     The day the Executive Order issued, Attorney General Barr stated that "those who assist the ICC's politically motivated investigation … will suffer serious consequences.  The Department of Justice fully supports these measures and will vigorously enforce the sanctions imposed today under the executive order to the fullest extent of the law."

**The Bensouda and Mochochoko Designations**

82.     On September 2, 2020, Secretary Pompeo announced at a press conference: "Pursuant to Executive Order 13928, the United States will designate ICC Prosecutor Fatou Bensouda, and the ICC's Head of Jurisdiction, Complementarity, and Cooperation Division Phakiso Mochochoko for having materially assisted Prosecutor Bensouda."

83.     Secretary Pompeo stated that same day that "[i]ndividuals and entities that continue to materially support those [designated] risk exposure to sanctions."

84.     Also on September 2, 2020, the Department of State issued a press statement on its website, stating: "[P]ursuant to Executive Order (E.O.) 13928, the United States is designating ICC Prosecutor Fatou Bensouda for having directly engaged in an effort to investigate U.S. personnel, and the ICC's Head of the Jurisdiction, Complementarity and Cooperation Division Phakiso Mochochoko for having materially assisted Prosecutor Bensouda."

85.     On September 2, 2020, OFAC added Ms. Bensouda and Mr. Mochochoko to its Specially Designated Nationals List.

**The Threats to Plaintiffs of Enforcement of IEEPA's Civil and Criminal Penalties and Designation Under the Executive Order, and the Present and Future Chill on Their Protected Speech**

86.     The threat of enforcement of IEEPA's civil and criminal penalties has injured, and continues to injure, Plaintiffs by causing them to discontinue activities they were performing before the Executive Order was promulgated, and Ms. Bensouda and Mr. Mochochoko were designated, and causing them to abandon or reconsider acts they had planned to perform.

87.     The threat of designation under the Executive Order and Regulations has injured, and continues to injure, Plaintiffs by causing them to discontinue activities they were performing before the Executive Order was promulgated, as well as since Ms. Bensouda and Mr. Mochochoko were designated, and causing them to abandon or reconsider acts they had planned to perform.

88.     In particular, the following threats have caused Plaintiffs to discontinue, abandon, or reconsider their ongoing and planned future acts:

      a.  *First*, interacting with Ms. Bensouda or Mr. Mochochoko would violate the Executive Order and the Regulations and in turn violate IEEPA.  Thus, there is a threat that IEEPA's civil and criminal penalties will be enforced against Plaintiffs;

      b.  *Second*, interacting with Ms. Bensouda or Mr. Mochochoko would constitute material assistance, material support, or services to or in support of a designated person under Section 1(a)(i)(C) of the Executive Order.  Thus, there is a threat that the Secretary of State will designate Plaintiffs for interacting with Ms. Bensouda or Mr. Mochochoko; and

26

    c. *Third*, some of Plaintiffs' planned acts might constitute direct engagement, material support, material assistance, or services to or in support of an activity listed in Sections 1(a)(i)(A) or 1(a)(i)(B) of the Executive Order.  Thus, there is a threat that the Secretary of State will designate Plaintiffs for performing those acts.

89.     The acts which Plaintiffs planned to undertake, but which they have abandoned or reconsidered in light of the Executive Order, include the following:

*Open Society Justice Initiative*

90.     Plaintiff OSJI has participated in an ongoing formal "ICC review process," which commenced in January 2020.  Through this process, which seeks to improve the performance and functioning of the ICC, including the Office of the Prosecutor, Plaintiff OSJI provided input on improvements in investigations and prosecutions by conducting research and workshops (in which ICC officials participated), publishing reports, making recommendations through formal submissions to the independent body reviewing the ICC, and directly communicating with Ms. Bensouda and members of the Office of the Prosecutor.  The threats of enforcement and designation have caused Plaintiff OSJI to refrain from certain activities that pertain specifically to the Office of the Prosecutor.  OSJI will therefore miss a unique opportunity to provide input into contemplated reforms regarding the Office of the Prosecutor's structure and with respect to preliminary examinations, investigations and prosecutions.  This will interrupt Plaintiff OSJI's long-term project of bringing external expertise to bear in identifying and advocating for improvements.

91.     Plaintiff OSJI had planned to continue training civil society groups about how the Office of the Prosecutor receives information and evidence provided by civil society in the context of ICC investigations.  The threats of enforcement and designation have caused Plaintiff OSJI to refrain from continuing such training in a number of countries.

92.     Plaintiff OSJI has been requested by civil society and victims' rights organizations in Palestine to undertake additional trainings and provide advice on submitting evidence to the Office of the Prosecutor relating to international crimes allegedly committed on Palestinian territory.  The threats of enforcement and designation have prevented Plaintiff OSJI from committing to undertake such training and advice.

93.      Plaintiff OSJI has stopped initiating or accepting meetings with Ms. Bensouda, Mr. Mochochoko, or anyone operating directly under their control or acting for them or on their behalf, and has refrained from attending any meeting where such persons are present when attendance could lead to a substantial exchange with them.  Plaintiff OSJI has also refrained from taking part in meetings between civil society and the ICC when those are likely to lead to substantial interactions with Ms. Bensouda, Mr. Mochochoko, or anyone operating directly under their control or acting for them or on their behalf.  Refraining from attending such meetings affects Plaintiff OSJI's capacity to learn and interact with the above-mentioned ICC staff, including Plaintiff OSJI's ability to monitor efforts to reform the ICC, to be in a position to inform other actors (including local civil society and other entities within the Open Society network) of developments in ICC situations and cases, and to shape Plaintiff OSJI's advocacy with ICC States Parties.

94.     Plaintiff OSJI's fear of the threats of enforcement and designation is furthered by an open letter sent on August 5, 2020 from Representative Andy Biggs (5th District, Arizona) to

Attorney General Barr, urging the Attorney General to take action against the ICC and "key non-governmental organizations driving the ICC's investigation."   Representative Biggs' letter referenced a report that named the Open Society Foundations—the umbrella network of which Plaintiff OSJI is a member—as one of the non-governmental organizations allegedly driving the investigation.

*Diane Marie Amann*

95.    Prior to issuance of the Executive Order and the subsequent designations, Plaintiff Amann had planned to continue to provide advice to Ms. Bensouda, as well as assist with trainings, draft policies and procedures, and draft legal submissions, where appropriate, to support the Office of the Prosecutor on activities it will undertake with regards to children in and affected by armed conflict.  The threats of enforcement and designation have caused Plaintiff Amann to stop advising the Office of the Prosecutor and Ms. Bensouda.

96.    Plaintiff Amann had planned to engage student research assistants to assist her in providing advice to Ms. Bensouda and the Office of the Prosecutor.  The threats of enforcement and designation have caused Plaintiff Amann to refrain from engaging student researchers this academic year for this purpose.

97.    The threats of enforcement and designation have caused Plaintiff Amann not to organize or speak at conferences concerning the ICC.

*Milena Sterio*

98.    Prior to issuance of the Executive Order and the subsequent designations, Plaintiff Sterio had planned to continue to interact with the ICC's Office of the Prosecutor on various

matters, including those connected with the Afghanistan investigation.  The threats of enforcement and designation have caused her to reconsider doing so.

99.     Plaintiff Sterio had planned to submit additional *amicus curiae* briefs on ICC cases, including upon request from the Office of the Prosecutor, potentially on the situations in the Democratic Republic of the Congo, the Central African Republic, Darfur, Libya, and Mali.  The threats of enforcement and designation have caused her to refrain from doing so.

100.    Plaintiff Sterio had planned to continue to supervise her students' advisory research submitted to the ICC Office of the Prosecutor.  The threats of enforcement and designation have caused her to refrain from doing so.

101.    Plaintiff Sterio had planned to continue attending conferences, such as the ICC Scholars Forum in June 2021 in The Hague, and the International Humanitarian Law Dialogs in August 2021, where she had planned to present additional work about the ICC.  The threats of enforcement and designation have caused her to reconsider doing so.

*Margaret deGuzman*

102.    Before the designations of Ms. Bensouda and Mr. Mochochoko, Plaintiff deGuzman was working on an *amicus curiae* brief to be submitted to the ICC that advanced a position supportive of the Office of the Prosecutor.  Due to the threats of enforcement and designation, Plaintiff deGuzman terminated her involvement in the *amicus curiae* brief.

103.    Prior to issuance of the Executive Order and the subsequent designations, Plaintiff deGuzman had planned to submit additional *amicus curiae* briefs to the ICC in support of positions advanced by the Office of the Prosecutor.  The threats of enforcement and designation have caused her to refrain from doing so.

30

104.     Plaintiff deGuzman has close working relationships with staff members in the Office of the Prosecutor, including in the Jurisdiction, Complementarity and Cooperation Division, with whom she consults frequently about their work.  The threats of enforcement and designation have caused her to reconsider engaging in communications with them.

105.     Because a primary audience of her recently published book on international criminal law (*supra*, paragraph 52) is the Office of the Prosecutor, Plaintiff deGuzman had planned to present the book to ICC staff in that Office.  Due to the threats of enforcement and designation, Plaintiff deGuzman is no longer planning such a presentation.

*Gabor Rona*

106.     Prior to issuance of the Executive Order and the subsequent designations, Plaintiff Rona had planned to submit further *amicus curiae* briefs to the ICC in support of positions advanced by the Office of the Prosecutor.  The threats of enforcement and designation have caused him to refrain from doing so.

\* \* \* \* \*

107.     Each Plaintiff has discontinued, abandoned, or reconsidered acts that would have involved the transmission of information or informational materials from the United States to a foreign country.

108.     In mid-September 2020, Plaintiffs had each been asked to sign on to a statement drafted by the Washington Working Group for the ICC, opposing and expressing grave concern with U.S. sanctions on the ICC, and calling on the U.S. government to rescind the Executive Order. On September 22, 2020, the statement was released publicly. The threats of enforcement and designation caused Plaintiffs to decide not to sign the statement.

31

109.     The threats of enforcement and designation have caused Plaintiffs Amann, Sterio, deGuzman, and Rona to refrain from writing or publicly commenting on issues related to the situation in Afghanistan and the ICC more generally.

### Plaintiff OSJI's Efforts to Clarify the Meaning of the Executive Order

110.     Shortly after the issuance of the Executive Order, Plaintiff OSJI subscribed to email alerts with OFAC regarding "Blocking Property of Certain Persons Associated with the International Criminal Court Sanctions" and frequented the assigned sanctions program page on OFAC's website.

*Plaintiff OSJI's Request for Interpretive Ruling from OFAC*

111.     On August 24, 2020, Plaintiff OSJI submitted a "Request for Interpretive Ruling Regarding Executive Order 13928" to OFAC (the "OFAC Request").  A true and correct copy of the OFAC Request is attached hereto as Exhibit 1.

112.     In the OFAC Request, Plaintiff OSJI requested guidance from OFAC concerning what acts constitute "materially assist[ing]" or providing "services" to or in support of activities under the Executive Order.  Specifically, Plaintiff OSJI asked about two categories of acts: (1) "General advice, training or support to the ICC"; and (2) "Specific advice, training or support to the ICC relating to subsections A or B of Section 1(a)(i)."  The OFAC Request provided examples of acts in each category.

113.     The OFAC Request requested that OFAC respond within 20 calendar days, explaining that September and October are critical time periods for persons concerned with matters relating to the ICC because the annual Assembly of States Parties is scheduled to take place December 7-17, 2020.

114.    On September 8, 2020, OFAC acknowledged the OFAC Request by email and assigned a case number.  A true and correct copy of this email is attached hereto as Exhibit 2.  On September 9, 2020, an OFAC representative sent an email to Plaintiff OSJI stating that the representative had been assigned as the Licensing Officer "working on OFAC's response to [Plaintiff OSJI's] request for guidance on recent U.S. Government actions regarding the International Criminal Court," and "may be reaching out … in the coming weeks with any questions."  On September 15, 2020, Plaintiff OSJI responded and reminded OFAC that the request was time-sensitive and requested an estimate of when Plaintiff OSJI would receive a final response.  A true and correct copy of this email exchange is attached hereto as Exhibit 3.

115.    Plaintiff OSJI has received no further response from OFAC.

116.    The Regulations do not clarify the meaning of the terms that were the subject of Plaintiff OSJI's OFAC Request.

*Plaintiff OSJI's Freedom of Information Act Requests to the Departments*

117.    On July 9, 2020, Plaintiff OSJI submitted separate but identical Freedom of Information Act requests (collectively, the "FOIA Requests") to each of the Departments.  Item 1 of the FOIA Requests requested records containing particular search terms related to the ICC and the Executive Order.  Item 2 of the FOIA Requests requested cables and communications to and from U.S. embassies regarding policy positions, requests and queries, to and from host governments pertaining to the ICC.  The FOIA Requests requested expedited processing under 5 U.S.C. § 552(a)(6)(E), 28 CFR § 16.5(e)(1)(iii), 31 CFR § 1.4(e)(1)(iii), and 22 CFR § 171.11(f)(3), and a fee waiver under 5 U.S.C. § 552(a)(4)(A)(iii).  A true and correct copy of the FOIA Requests is attached hereto as Exhibit 4.

118.    The FOIA Requests sought expedited processing on the ground that Plaintiff OSJI is a non-profit organization that gathers information about government activity which is of substantial interest to the public, distills that information, and disseminates it to a wide audience, and that Plaintiff OSJI intended to do so with respect to the records it sought in the FOIA Requests.

119.    Each of the Departments denied Plaintiff OSJI's request for expedited processing, and OSJI has administratively appealed those denials.

120.    Each Department constructively denied Plaintiff OSJI's FOIA Requests by failing to respond within the statutorily prescribed timeframe.

121.    Plaintiff OSJI has worked with each of the Departments to clarify or narrow the FOIA Requests.  However, none of the Departments has produced responsive documents.

## CAUSES OF ACTION

### COUNT I
**Violation of the Free Speech Clause of the First Amendment to the U.S. Constitution**
(***All Plaintiffs v. All Defendants***)

122.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

123.    The Executive Order and the Regulations violate the First Amendment by barring Plaintiffs from engaging in certain speech and advocacy to support the ICC, and by subjecting Plaintiffs to the prospect of civil or criminal sanctions, and designation, for engaging in that speech or advocacy.

### COUNT II
**Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution**
(***All Plaintiffs v. All Defendants***)

124.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

34

125.    The Executive Order's terms "materially assisted," "material … support," and "services to or in support of" violate the Fifth Amendment because they provide no notice to Plaintiffs as to what acts are prohibited, and permit arbitrary enforcement of the Executive Order.

126.    The Executive Order's term "foreign person" violates the Fifth Amendment because it provides no notice to Plaintiffs as to whether they could be subject to designation under the Executive Order, and permits its arbitrary enforcement.

127.    The Regulations violate the Fifth Amendment by failing to clarify the meaning of any of these terms.

## COUNT III
### *Ultra Vires* Action under IEEPA, 50 U.S.C. §§ 1701, *et seq.*
### (*All Plaintiffs v. All Defendants*)

128.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

129.    IEEPA does not authorize the President to "regulate or prohibit, directly or indirectly …  the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds."  50 U.S.C. § 1702(b)(3).

130.    Plaintiffs past and planned future acts include the importation and/or exportation of "information or informational materials" within the meaning of IEEPA.

131.    The Executive Order is *ultra vires* because it regulates or prohibits, and authorizes Defendants to regulate or prohibit, acts that are exempt from regulation or prohibition under IEEPA.

132.    The Regulations are *ultra vires* because they regulate or prohibit acts that are exempt from regulation or prohibition under IEEPA.

### COUNT IV
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706
### (*All Plaintiffs v. All Defendants*)

133.    The Administrative Procedure Act ("APA") requires courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)-(C).

134.    In enacting and implementing the Executive Order and the Regulations, Defendants did not act in accordance with the First and Fifth Amendment to the U.S. Constitution, violated Plaintiffs' constitutional rights under the First and Fifth Amendments, and exceeded their statutory authority under IEEPA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the Executive Order and the Regulations violate the First and Fifth Amendments to the United States Constitution, are *ultra vires* under IEEPA, and violate the APA;

B.    Preliminarily and permanently enjoin Defendants from designating Plaintiffs under the Executive Order or the Regulations, or enforcing IEEPA's civil or criminal penalty provisions against them;

C.    Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

D.   Grant such other relief as the Court may deem just and proper.

Dated: October 1, 2020

Respectfully submitted

**OPEN SOCIETY JUSTICE INITIATIVE, DIANE MARIE AMANN, MILENA STERIO, MARGARET DEGUZMAN and GABOR RONA**

By their attorneys,

/s/ Nicholas M. Renzler
Nicholas M. Renzler (NR1608)
Brittan Heller (*pro hac vice* to be submitted)
FOLEY HOAG LLP
1717 K Street, N.W.
Washington, DC 20006
202-223-1200
nrenzler@foleyhoag.com
bheller@foleyhoag.com

Shrutih Tewarie (SR1705)
FOLEY HOAG LLP
1301 Avenue of the America
New York, NY 10019
646-927-5500
stewarie@foleyhoag.com

Andrew B. Loewenstein (*pro hac vice* to be submitted)
Stephen Stich (application for admission to be submitted)
Ned Melanson (*pro hac vice* to be submitted)
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
617-832-1000
aloewenstein@foleyhoag.com
sstich@foleyhoag.com
nmelanson@foleyhoag.com