

November 3, 2020

**By ECF**

Hon. Katherine Polk Failla, U.S.D.J.
United States District Court for the Southern District of New York
Courtroom 618, Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 100017

Re:   *Open Society Justice Initiative, et al. v. Trump, et al.*
No. 1:20-cv-05441 (KPF)

Dear Judge Failla:

I write on behalf of the Brennan Center for Justice at NYU School of Law to seek the Court's leave to allow the Brennan Center to submit the attached *amicus curiae* brief in this matter, and in support of Plaintiffs' motion for a preliminary injunction. All parties have consented to the filing of this amicus brief.

The Brennan Center is a not-for-profit, non-partisan think tank and public interest law institute that seeks to improve systems of democracy and justice. The Brennan Center's interest in this case stems from an on-going research and advocacy project into various types of emergency powers, including the statutory emergency powers—such as the International Emergency Economic Powers Act (IEEPA)—that fall within the purview of the National Emergencies Act of 1976.

The Brennan Center has expertise in emergency powers and in the IEEPA, and seeks to brief this Court on relevant matters concerning issues raised by this case. This includes: the background and functioning of the National Emergencies Act of 1976 which governs IEEPA; the background and functioning of IEEPA itself; and the background and functioning of the "informational materials" exemption contained within IEEPA, which forms the basis of one of Plaintiffs' claims.

Accordingly, the Brennan Center respectfully requests the Court's leave to allow it to file the attached proposed *amicus curiae* brief.

Respectfully submitted,

/s/ Andrew Boyle

(admission *pro hac vice* pending)
*Counsel for Amicus Curiae*
Brennan Center for Justice
1140 Connecticut Ave., NW
Suite 1150
Washington, D.C. 20036
Andrew.Boyle@nyu.edu
(202) 280-4524

cc:     All counsel of record, via ECF

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OPEN SOCIETY JUSTICE INITIATIVE; DIANE MARIE AMANN; MILENA STERIO; MARGARET DEGUZMAN; GABOR RONA,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States; UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, Secretary of State; UNITED STATES DEPARTMENT OF THE TREASURY; STEVEN T. MNUCHIN, Secretary of the Treasury; UNITED STATES DEPARTMENT OF JUSTICE; WILLIAM P. BARR, United States Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; ANDREA M. GACKI, Director of the Office of Foreign Assets Control,<br><br>Defendants. | Civil Action No. 1:20-cv-08121-KPF |

**BRIEF OF AMICUS CURIAE THE BRENNAN CENTER FOR JUSTICE AT NYU**

**SCHOOL OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY**

**INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES ........................................................................ iii

INTERESTS OF AMICUS .......................................................................... 1

INTRODUCTION ........................................................................................ 1

ARGUMENT ................................................................................................ 4

   I.    The National Emergencies Act of 1976 ............................................ 4

   II.    The International Emergency Economic Powers Act ............................... 10

     a.   Background to the Informational Materials Exemption .......................... 15

     b.   Applicable Scope of the Informational Materials Exemption ..................... 20

   III.   Robust Judicial Review is Imperative ..................................... 22

CONCLUSION ............................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Capital Cities/ABC, Inc. v. Brady,* 740 F.Supp. 1007 (S.D.N.Y. 1990) ........................................ 18

*Cernuda v. Heavey,* 720 F.Supp. 1544 (S.D. Fla. 1989) ............................................................. 17

*Chen v. B.I.A.,* 164 F. Supp. 3d 612 (S.D.N.Y. 2016) .................................................................. 20

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) ......................................................................... 23

Defendants' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj., *TikTok Inc. v. Trump*, No. 1:20-cv-
02658 CJN (D.D.C. Sept. 25, 2020) ........................................................................................ 22

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) .............................................................................. 10, 23

*Kalantari v. NITV, Inc.*, 352 F.3d 1202 (9th Cir. 2003) ................................................... 16, 18, 21

*Marland v. Trump*, No. 90-346 (E.D.Pa. Oct. 30, 2020) (order granting preliminary injunction) 24

*N.Y.C. Health and Hosp. Corp. v. Perales*, 954 F.2d 854 (2d Cir. 1992) ................................... 20

Order Denying Mot. to Stay, *U.S. WeChat Users All. v. Trump*, No. 20-cv-05910 (N.D. Cal. Oct.
23, 2020) .................................................................................................................................. 24

Order, *U.S. WeChat Users All. v. Trump*, No. 20-16908 (9th Cir. Oct. 26, 2020) ....................... 24

*Regan v. Wald*, 468 U.S. 222 (1984) ................................................................................. 1, 11, 12

*Sierra Club v. Trump*, No. 19-17501, No. 19-17502, No. 20-15044, 2020 WL 5989377 (9th Cir.).
.............................................................................................................................. 22, 23, 24, 25

*TikTok Inc. v. Trump*, No. 1:20-cv-02658 CJN, 2020 WL 5763634 (D.D.C. Sept. 27, 2020) .... 21,
23, 24

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) .................................................................................. 21

*U.S. WeChat Users All. v. Trump*, No. 20-cv-05910-LB, 2020 WL 5592848 (N.D. Cal. Sept. 19,
2020) (order granting preliminary injunction); ......................................................................... 24

*Walsh v. Brady*, 927 F.2d 1229 (D.C. Cir. 1991) ....................................................................... 18

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ........................................ 1, 24, 25

**CONSTITUTION AND STATUTES**

31 C.F.R. § 520 (2020). ................................................................................................. 2

Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, 108 Stat
382 (1994) ............................................................................................................ 18

International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, 91 Stat. 1625
(1977) (codified as amended at 50 U.S.C. § 1701 *et seq.*)................................................. passim

National Emergencies Act of 1976 (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as
amended at 50 U.S.C. § 1601-1651), ............................................................................. passim

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, § 2502, 102 Stat. 1107
(1988) ............................................................................................................... 16, 17

Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917) (codified as
amended at 50 U.S.C. § 4301 *et seq.*) ........................................................................ 2, 7, 10

U.S. Const. art. 1, § 8, cl. 15 ........................................................................................ 5

U.S. Const. art. 1, § 9, cl. 2 ........................................................................................ 5

U.S. Const. art. II ................................................................................................... 5

**OTHER AUTHORITIES**

*A Guide to Emergency Powers and Their Use*, Brennan Ctr. for Justice (April 24, 2020),
https://tinyurl.com/y78jkjvp ....................................................................................... 9

Adam Smith, *Dissecting the Executive Order on Int'l Criminal Court Sanctions: Scope,
Effectiveness, and Tradeoffs,* Just Security (June 15, 2020), https://tinyurl.com/y2cgo666 ....... 2

*Blocking Property of Certain Persons Associated with the International Criminal Court
Designations*, U.S. Department of the Treasury, (Sept. 2, 2020), https://tinyurl.com/y53fkd3l  3

Christopher A. Casey et al., Cong. Research Serv., *R45618, The International Emergency Economic Powers Act: Origins, Evolution, and Use* 1 (2020), https://tinyurl.com/y2m7jare .... 2

Constitutions Containing Emergency Provisions, *Constitute*, https://tinyurl.com/y6op33d7 (last visited Apr. 25, 2019) ................................................................................................ 5

Elaine Halchin, Cong. Research Serv., *98-505, National Emergency Powers* (2020), https://tinyurl.com/y3mvekk3 .................................................................................... 5, 6, 7

Jimmy Carter, *Presidential War Powers Bill Statement on Signing H.R. 7738 Into Law*, American Presidency Project (Dec. 28, 1977), https://tinyurl.com/y6cphcez ......................... 14

Laura K. Donohue, *Constitutional and Legal Challenges to the Anti-Terrorist Financing Regime*, 43 Wake Forest L. Rev. 643 (2008). ........................................................................ 13

President Donald J. Trump (@realDonaldTrump), Twitter (Aug. 23, 2019, 11:58 PM), https://tinyurl.com/y62val2x ...................................................................................... 22

Tamara Keith, *If Trump Declares an Emergency to Build the Wall, Congress Can Block Him*, N.P.R. (Feb. 11, 2019), https://tinyurl.com/y4vobv6m .......................................... 10

Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209 (1980) .................................................................................................................. 5

## OTHER LEGISLATIVE AUTHORITIES

120 Cong. Rec. S. 15784-86 (daily ed. Aug. 22, 1974) ................................................ 6

121 Cong. Rec. H.R. H8325-H8341 (daily ed. Sept. 4, 1972) ...................................... 6

123 Cong. Rec. H2217 (1977) (daily ed. March 16, 1977) .......................................... 11

132 Cong. Rec. S3707-04 (1986) ................................................................................ 16

95 Cong. Rec. H235 (daily ed. Jan. 10, 1977) ........................................................... 13

*Amending the Trading With the Enemy Act: Hearing Before the Subcomm. on Int'l Finance of the H. Comm. on Banking and Currency*, 95th Cong. (1977) .................................. 12

*Emergency Controls on International Economic Transactions: Hearing Before the Subcomm. on Int'l Policy and Trade of the H. Comm on Foreign Affs.*, 95th Cong. (1977) .......................... 12

H.R. Conf. Rep. 103-482 (1994)............................................................................................. 19

H.R. Rep. No. 95-459 (1977)........................................................................................... 12, 16

*Revision of Trading With the Enemy Act: Hearing Before the H. Comm. on Int'l Relations*, 95th Cong. (1977)............................................................................................. 11, 13, 14

S. 977, 94th Cong. (1975)....................................................................................................... 8

S. Comm. on Government Operations and the Spec. Comm. on National Emergencies and Delegated Emergency Powers, *The National Emergencies Act (Public Law 94-412), Source Book: Legislative History, Text, and Other Documents* (1976) ...................................... 6, 7, 8, 9

S. Rep. No. 94-1168 (1976)..................................................................................................... 9

S. Res. 242, 93rd Cong. (1974)............................................................................................. 6

## REGULATIONS

Cuban Assets Control Regulations, 31 C.F.R. § 515.206........................................................... 20

Foreign Assets Control Regulations and Cuban Assets Control Regulations, 54 Fed. Reg. 5229 (Feb. 2, 1989) .................................................................................................................. 18

Iranian Transactions and Sanctions Regulations, 31 C.F.R. § 560.210(c)(2).............................. 20

## EXECUTIVE ORDERS AND PROCLAMATIONS

Exec. Order No. 13928, 85 Fed. Reg. 36139 (June 11, 2020).................................................. 1, 2

## INTERESTS OF AMICUS

*Amicus curiae* the Brennan Center for Justice at NYU School of Law ("Brennan Center") is a not-for-profit, non-partisan think tank and public interest law institute that seeks to improve systems of democracy and justice. The Brennan Center's interest in this case stems from its research and advocacy on various types of emergency powers, including the statutory emergency powers—such as the International Emergency Economic Powers Act—that fall within the purview of the National Emergencies Act of 1976. Based on the expertise we have acquired in this area, we seek to provide the Court with important background and context for the laws Defendants have invoked in Executive Order 13928, "Blocking Property of Certain Persons Associated with the International Criminal Court," and under which Defendants have designated International Criminal Court staff members. Exec. Order No. 13928, 85 Fed. Reg. 36139 (June 11, 2020).

## INTRODUCTION

Emergency powers, by design, distort the normal functioning of a democracy. They are a license that the legislature gives to the president so that he or she may act rapidly, and in ways that ordinarily would not be authorized, to confront situations that "present[] an imminent threat requiring immediate response." *Regan v. Wald*, 468 U.S. 222, 246 (1984) (Blackmun, J., dissenting). But because they swell the power of the executive beyond what Congress considers appropriate in normal times, they are tempting even in the absence of an emergency to presidents who chafe at constraints. "[E]mergency powers … tend to kindle emergencies." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring).

In Executive Order 13928, "Blocking Property of Certain Persons Associated with the International Criminal Court," President Trump declared a national emergency pursuant to the National Emergencies Act of 1976 (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. § 1601-1651), and stated that the International Criminal Court (ICC) poses

1

"an unusual and extraordinary threat to the national security and foreign policy of the United

States" pursuant to the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-

223, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. § 1701 *et seq.*). Exec. Order No.

13928, 85 Fed. Reg. 36139 (June 11, 2020). Relying on IEEPA's powers, the executive order

establishes a sanctions regime targeted at foreign natural or corporate persons working at or with

the ICC. The order prohibits, under penalty of substantial civil fines and criminal prosecution,

transactions with those designated, and requires blocking or freezing of the designated persons'

property.

IEEPA sanctions are no mere inconvenience. IEEPA's predecessor statute, the Trading With

the Enemy Act, Pub. L. No. 65-91, ch. 106 § 5(b)(1), 40 Stat. 415 (1917) (codified as amended at

50 U.S.C. § 4301 *et seq.*), was (and is) a tool of economic warfare that originated in the midst of

World War I. Christopher A. Casey et al., Cong. Research Serv., *R45618, The International

Emergency Economic Powers Act: Origins, Evolution, and Use* 1 (2020),

https://tinyurl.com/y2m7jare.  IEEPA's leverage is derived from the centrality of the United

States and the U.S. dollar in the global financial system. Due to the reach of that system, some

have described IEEPA sanctions as "civil death."  Adam Smith, *Dissecting the Executive Order

on Int'l Criminal Court Sanctions: Scope, Effectiveness, and Tradeoffs,* Just Security (June 15,

2020), https://tinyurl.com/y2cgo666.

The U.S. Department of Treasury's Office of Foreign Assets Control has issued regulations

implementing the ICC executive order, 31 C.F.R. § 520 (2020). Under powers delegated by the

executive order, the U.S. Secretary of State has designated the ICC's chief prosecutor, Fatou

Bensouda, and a second ICC employee in the prosecution office, Phakiso Mochochoko. *Blocking*

*Property of Certain Persons Associated with the International Criminal Court Designations*, U.S. Department of the Treasury, (Sept. 2, 2020), https://tinyurl.com/y53fkd3l.

The Trump Administration's use of the NEA and IEEPA to sanction international civil servants working at an international court with 123 state party members, including many U.S. allies, is an egregious abuse of emergency powers. These professionals have nothing in common with ordinary IEEPA targets: those accused of corruption, organized crime, human rights abuses, terrorism, or drug trafficking. Under no rational analysis could there said to be a national emergency, or that the ICC staff and their activities pose an "unusual and extraordinary threat" to the United States. Moreover, that the government has devised the sanctions in a way that potentially claims to prohibit—and demonstrably chills—Plaintiffs' ability to engage in activities such as submitting amicus briefs, advising the court on the protection of children, and supervising law students wanting to obtain valuable practical experience in international humanitarian law, is further evidence that the sanctions are not only fundamentally misguided, but antithetical to Congress's intent. *See* Mem. of Law in Support of Pls.' Mot. for Prelim. Inj., at *9-10, ECF 28-1. This is particularly evident because Congress has explicitly exempted from IEEPA's powers the ability to prohibit the transfer of information or informational materials. *See* 50 U.S.C. § 1702(b)(3).

The courts play an essential role in checking such abuses of emergency powers. We expect the government to argue, as it has in other lawsuits challenging the President's use of the NEA and IEEPA, that the court should defer to presidential invocations of emergency powers, and refrain from interpretations that place limits on those powers. As Amicus shows in this brief, however, the legislative history of the NEA and IEEPA demonstrates that they were meant to constrain presidents, not afford them limitless discretion. In addition, the legislative history and

content of the "informational materials" exemption to IEEPA shows that it was meant to be read broadly to protect First Amendment free speech activities. Judicial review is necessary to ensure that these laws are interpreted and applied in a manner consistent with Congress's intent—not exploited to attack institutions seeking accountability for atrocity crimes.

## ARGUMENT

The sanctions powers the President relies on in Executive Order 13928 and that the Treasury Department relies on in promulgating the implementing regulations depend on the National Emergencies Act and the International Emergency Economic Powers Act (IEEPA). To reach the powers of the latter, the government must satisfy the requirements of the former, and is subject to its strictures. Even once the terms of the NEA are satisfied, in order to unlock IEEPA's powers the government must then also satisfy additional requirements contained in that statute. When it has permissibly accessed IEEPA's powers, the government must abide by the limits of the powers afforded therein. Although Plaintiffs do not challenge that the government has met the requirements for invoking the NEA and IEEPA as such, the history and operation of these statutes inform the application of the particular powers contained within IEEPA that Plaintiffs do challenge, demonstrating Congress's intent that the powers be constrained, as well as the need for robust judicial review. For these reasons, Amicus provides background on both the NEA and IEEPA, before addressing the informational materials exemption.

### I.    The National Emergencies Act of 1976

To understand the purpose of the National Emergencies Act (NEA), it is necessary to briefly summarize the history of statutory emergency powers in the United States. Unlike most other

countries' constitutions,[1] the U.S. Constitution does not provide the president with any explicit emergency powers. *See generally* U.S. Const. art. II.[2] Accordingly, from the time of the country's founding, presidents have relied on Congress to provide them with enhanced authorities in emergency situations. Throughout the eighteenth and early nineteenth centuries, Congress periodically enacted laws giving presidents standby authorities that they could use in their discretion during military, economic, or labor crises. *See* Elaine Halchin, Cong. Research Serv., *98-505, National Emergency Powers* 1 (2020), https://tinyurl.com/y3mvekk3.

Beginning in World War I, a new procedure for invoking statutory emergency powers evolved. Presidents would declare a national emergency, and this declaration would give them access to statutory authorities that would otherwise lie dormant. *See* Halchin, *supra*, at 1. This system continues to this day. Before the enactment of the NEA, however, there was no overarching statute regulating it. *See id.* There was little transparency or congressional oversight with respect to the presidents' use of emergency powers, and nothing to prevent states of emergency from lingering indefinitely.

In the 1970s, several scandals involving executive branch overreach—including Watergate, the bombing of Cambodia, and domestic spying by the CIA—prompted Congress to investigate the exercise of executive power in national security matters, and to enact several laws aimed at reasserting Congress's role as a coequal branch of government and a check on executive authority. *See generally* Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209 (1980). It was in this context that a special Senate committee, which

---

[1] A review of current constitutions reveals that at least 178 countries' constitutions have provisions for emergency rule. *See* Constitutions Containing Emergency Provisions, *Constitute*, https://tinyurl.com/y6op33d7 (last visited Apr. 25, 2019).

[2] Those powers that could be considered "emergency powers" are given to Congress under Article I, such as the power to suspend *habeas corpus*, *see* U.S. Const. art. 1, § 9, cl. 2, and to call forth "the Militia" to "suppress Insurrections and repel Invasions." U.S. Const. art. 1, § 8, cl. 15.

eventually came to be named the Special Committee on National Emergencies and Delegated

Emergency Powers, was formed to examine presidential use of emergency powers. *See* S. Res.

242, 93rd Cong. (1974); Halchin, *supra*, at 7-8.

The immediate impetus for the committee's formation was Republican Senator Charles

Mathias's discovery that an emergency declaration issued in 1950, at the start of the Korean

War, was still in place and was being used to prosecute the war in Vietnam. *See* Halchin, *supra*,

at 17. On closer examination, the committee learned that four clearly outdated states of

emergency—issued in 1933, 1950, 1970, and 1971—were still in effect. *See id.* at 7. As Senator

Church stated: "few, if any, foresaw that [these] temporary states of emergency . . . would

become what are now regarded collectively as virtual permanent states of emergency." 120

Cong. Rec. S. 15784-86 (daily ed. Aug. 22, 1974) (statement of Sen. Church), *reprinted in* S.

Comm. on Government Operations and the Spec. Comm. on National Emergencies and

Delegated Emergency Powers, *The National Emergencies Act (Public Law 94-412), Source

Book: Legislative History, Text, and Other Documents*, at 73 (1976) [hereinafter *Spec. Comm. on

National Emergencies Source Book*]. One House Report examining the issue observed:

> [T]here has been an emergency in one form or another for the last 43 years. …
> The history of continued and almost routine utilization of such emergency
> authorities for years after the original crisis has passed … serves only to
> emphasize the fact that there is an urgent need to provide adequate laws to meet
> our present day needs. Legislation intended for use in crisis situations is by its
> nature not well suited to normal, day-to-day government operations.

121 Cong. Rec. H.R. H8325-H8341 (daily ed. Sept. 4, 1972) (statement of Rep. Rodino),

*reprinted in Spec. Comm. on National Emergencies Source Book*, *supra*, at 244.

The committee's work culminated in the introduction and passage of the NEA, which took

effect in 1978. The purpose of the law, evident in every facet of the legislative history, was to

place limits on presidential use of emergency powers. As summarized by the committee in

urging passage of the Act:

> While much work remains, none of it is more important than passage of the
> National Emergencies Act. Right now, hundreds of emergency statutes confer
> enough authority on the President to rule the country without reference to normal
> constitutional process. Revelations of how power has been abused by high
> government officials must give rise to concern about the potential exercise,
> unchecked by the Congress or the American people, of this extraordinary power.
> The National Emergencies Act would end this threat and insure that the powers
> now in the hands of the Executive will be utilized only in time of genuine
> emergency and then only under safeguards providing for Congressional review.

*Spec. Comm. on National Emergencies Source Book*, *supra*, at 50. The law employed various

mechanisms to this end.[3] There were several provisions intended to increase transparency and

facilitate congressional oversight with respect to the presidents' use of emergency powers.

These included requirements for the president to transmit declarations of national emergency to

Congress and publish them in the Federal Register, *see* National Emergencies Act, Pub. L. No.

94-412, § 201, 90 Stat. 1255 (codified at 50 U.S.C. § 1621); to specify in the declaration the

specific powers he intended to invoke, and to issue updates via published executive order where

necessary, *see* 50 U.S.C. § 1631; to transmit to Congress any orders, rules, or regulations issued

pursuant to an emergency declaration, *see* 50 U.S.C. § 1621; and to report to Congress every six

months on expenditures incurred by the government attributable to the exercise of emergency

powers, *see* 50 U.S.C. § 1641(c).

The NEA also included provisions designed to prevent states of emergency from becoming

permanent, and to give Congress a stronger and more active role in deciding whether states of

emergency should continue. In particular, the law provided that states of emergency would

---

[3] In addition to regulating future emergency declarations, the NEA returned most emergency powers then active to
dormancy after two years. *See* Halchin, *supra*, at 11. However, it excepted powers used under the Trading With the
Enemy Act, discussed *infra*.

terminate after a year unless renewed by the president, *see* 50 U.S.C. § 1622(d); it allowed

Congress to terminate states of emergency at any time through a concurrent resolution

(commonly referred to as a "legislative veto" because it would take effect without the president's

signature), *see* National Emergencies Act, Pub. L. No. 94-412, § 202, 90 Stat. 1255 (codified as

amended at 50 U.S.C. § 1622); and it *required* both houses of Congress to meet every six months

while an emergency declaration was in effect to "consider a vote" on whether to end the

emergency, *see* 50 U.S.C. § 1622(b).

As enacted, the law did not include a definition of "national emergency." Critically, however,

this omission was not intended as a grant of unlimited discretion. Under an earlier draft of the

legislation, the president was authorized to declare a national emergency "[i]n the event the

President finds that a proclamation of a national emergency is essential to the preservation,

protection and defense of the Constitution or to the common defense, safety, or well-being of the

territory or people of the United States." S. 977, 94th Cong. § 201 (a) (1975). One committee

report noted that this definition was "deliberately cast in broad terms that makes it clear that a

proclamation of a state of national emergency requires a grave national crisis." *Spec. Comm. on*

*National Emergencies Source Book*, *supra*, at 96.

The Senate Committee on Government Operations removed this language, not because it was

too limiting, but because the committee believed it to be too broad. As stated in the committee's

report:

> [F]ollowing consultations with several constitutional law experts, the committee
> concluded that section 201(a) is overly broad, and might be construed to delegate
> additional authority to the President with respect to declarations of national
> emergency. In the judgment of the committee, the language of this provision was
> unclear and ambiguous and might have been construed to confer upon the
> President statutory authority to declare national emergencies, other than that
> which he now has through various statutory delegations.

> The Committee amendment clarifies and narrows this language. The Committee decided that the definition of when a President is authorized to declare a national emergency should be left to the various statutes which give him extraordinary powers. The National Emergencies Act is not intended to enlarge or add to Executive power. Rather the statute is an effort by the Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes.

S. Rep. No. 94-1168, at 3 (1976), *reprinted in Spec. Comm. on National Emergencies Source Book, supra*, at 292. The committee's solution ultimately proved to be flawed, as the majority of the statutes in place today that confer power on the president during "national emergencies" do not include definitions of the term or criteria that must be met beyond the issuance of the declaration. *See A Guide to Emergency Powers and Their Use*, Brennan Ctr. for Justice (April 24, 2020), https://tinyurl.com/y78jkjvp. It is nonetheless significant that Congress believed that even a definition limiting national emergencies to grave national crises would be "overly broad." The notion that Congress intended the NEA as an affirmative delegation of unlimited discretion to the president is contradicted by this and every other aspect of the legislative history.

Moreover, where statutes granting emergency powers *do* include criteria beyond the mere declaration of an emergency, this legislative history underscores the importance of strictly interpreting and enforcing those limitations. In the current case, President Trump has invoked a statutory authority, IEEPA, that provides authorization for sanctions only during emergencies that constitute "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," 50 U.S.C. § 1701(a). In passing the NEA, Congress clearly intended for criteria like these to provide meaningful and enforceable checks on the president's authority to issue emergency declarations.

9

The most significant check on the president's use of emergency powers provided by the NEA was Congress's ability to terminate declarations of national emergency by concurrent resolution, *i.e.*, legislative veto. The NEA's effectiveness was thus significantly undermined by the Supreme Court's 1983 ruling that concurrent resolutions are unconstitutional. *See I.N.S. v. Chadha*, 462 U.S. 919, 954-55 (1983). Congress responded to the decision by substituting a joint resolution as the mechanism for terminating emergencies. *See* 50 U.S.C. § 1622(a)(1). Like any other legislation, a joint resolution must be signed into law by the president, and if the president vetoes the resolution, Congress can override the veto only with a two-thirds majority in both houses. This change greatly diluted the role of Congress as envisioned in the original Act. As a result, national emergencies are extremely easy for a president to invoke, and extremely difficult for Congress to terminate.[4] The NEA has thus proven weaker in implementation than in concept.

## II.     The International Emergency Economic Powers Act

Congress enacted the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. § 1701 *et seq.*), in 1977 as part of the same wave of reforms in the post-Nixon era that led to the passage of the NEA. It was Congress's sense that IEEPA's predecessor, the 1917 Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. § 4301 *et seq.*), which was originally intended for use only during wartime but was later amended to include national emergencies, had been used improperly. As Justice Blackmun explained, in enacting IEEPA "[i]t is clear that Congress intended to curtail the discretionary authority over foreign affairs that the

---

[4]  In addition, Congress has essentially ignored the NEA's requirement to meet every six months while an emergency is in place and consider a vote on whether to end the emergency. There is no indication that Congress ever did so prior to President Trump's declaration of a national emergency to fund the border wall. Before that time, only one resolution to end a state of emergency had ever been introduced, and the emergency declaration at issue was revoked before Congress could vote on it. *See* Tamara Keith, *If Trump Declares an Emergency to Build the Wall, Congress Can Block Him*, N.P.R. (Feb. 11, 2019), https://tinyurl.com/y4vobv6m.

President had accumulated because of past 'emergencies' that no longer fit Congress' conception of that term. To accomplish this goal, Congress amended the TWEA and enacted the IEEPA." *Regan*, 468 U.S. at 244 (1984) (Blackmun, J., dissenting).[5]

Although the NEA terminated, two years from its passage, almost all emergency authorities then in effect, 90 Stat. 1255, § 101(a); *see also Regan*, 468 U.S. at 246 n. 1 (1984), it exempted TWEA's Section 5(b), due to the complex and multiple ways in which the government was using those powers. 90 Stat. 1255, § 502(a)(1); 123 Cong. Rec. H2217 (1977) (daily ed. March 16, 1977) (statement of Rep. Bingham) (NEA excepted Section 5(b) of TWEA "because of that section's importance to the day-to-day functioning of the Government"). Instead, the NEA ordered that the relevant House and Senate Committees "make a complete study and investigation concerning that provision of law" and report on recommended revisions within 270 days. 90 Stat. 1255, § 502(b); *Revision of Trading With the Enemy Act: Hearing Before the H. Comm. on Int'l Relations*, 95th Cong. 1 (1977). This work fell to the House Committee on International Relations and the Senate Committee on Banking, Housing, and Urban Affairs. 123 Cong. Rec. H2217 (1977) (daily ed. March 16, 1977) (statement of Rep. Bingham).

Representative Jonathan Bingham, who chaired the House subcommittee that held hearings regarding TWEA reform, observed that "the executive branch wants to be free to continue to act with an enormous degree of discretion on the basis that an emergency exists, although by no commonsense application of the term could the situation be called an emergency" and that "the reaction of the subcommittee, and the reaction of the witnesses that we have had, has been that

---

[5] *See also Regan*, 468 U.S. at 244 (Blackmun, J., dissenting) (summarizing the history of TWEA, explaining "The historical record shows that once a President had declared the existence of a national emergency, he was slow to terminate it even after the circumstances or tensions that had led to the declaration could no longer be said to pose a threat of emergency proportion to the Nation," and describing TWEA's powers as "a one-way ratchet to enhance greatly the President's discretionary authority over foreign policy").

the situation that we are in is quite an incredible one, and it has to be substantially altered to try to conform with reality and with principle." *Emergency Controls on International Economic Transactions: Hearing Before the Subcomm. on Int'l Policy and Trade of the H. Comm on Foreign Affs.*, 95th Cong. 113-114 (1977) (statement of Rep. Bingham); *Regan,* 468 U.S. at 248 (Blackmun, J., dissenting). By the time of hearings on the legislation in the Senate later that year, the message had apparently gotten through. A representative of the executive branch testified that emergency powers "should be exercised within carefully constructed constraints … Furthermore, we are keenly aware that, on several occasions, section 5(b) has been hurriedly broadened during moments of national crisis…during which cases very little attention, frankly, was given to procedural safeguards consonant with the constitutional balance of powers." *Amending the Trading With the Enemy Act: Hearing Before the Subcomm. on Int'l Finance of the H. Comm. on Banking and Currency*, 95th Cong. 2 (1977) (statement of C. Fred Bergsten, Assistant Secretary of the Treasury for International Affairs).

The Report of the House Committee on International Relations concerning IEEPA stated that it intended for the law to be used for emergencies that

> are by their nature rare and brief, and are not to be equated with normal ongoing problems. A national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose. The emergency should be terminated in a timely manner when the factual state of emergency is over and not continued in effect for use in other circumstances. A state of national emergency should not be a normal state of affairs.

H.R. Rep. No. 95-459, at 10 (1977). The result of this process was H.R. 7738, which expressly limited TWEA to war-time use (*i.e.,* removing its ability to be utilized in time of national emergency), and that created IEEPA for peacetime use of most of section 5(b)'s powers in cases of national emergency under a new legal framework. *See* Laura K. Donohue, *Constitutional and*

*Legal Challenges to the Anti-Terrorist Financing Regime*, 43 Wake Forest L. Rev. 643, 647-48 (2008).

IEEPA's procedural requirements and congressional checks reflect Congress's concern at presidents' previous quotidian use of TWEA's powers. As Chairman Bingham stated: "Since the Nation has been in a declared state of emergency since 1933, the 'emergency' authorities provided in section 5(b) have in effect become routine authorities used to conduct the day-to-day business of the Government." 95 Cong. Rec. H235 (daily ed. Jan. 10, 1977) (statement of Rep. Bingham). Congress realized that the procedural requirements of the recently-passed NEA— including its potent legislative veto provision—would provide many of the safeguards that they considered advisable in relation to emergency economic powers, and that it therefore made sense for IEEPA to be subject to the NEA. As proposed by the House subcommittee studying the issue:

> [W]e should establish tighter procedures for future use of these powers, including consultation and reporting requirements, time limits on the use of the powers without review, and provision for congressional (as well as Presidential) termination. Since the National Emergencies Act already provides such procedures for all authorities based on national emergency, it seems logical to make the uses of international economic emergency powers subject to the National Emergencies Act.

*Revision of Trading With the Enemy Act: Hearing before the H. Comm. on Int'l Relations*, 95th Cong. 9 (1977) (statement of Rep. Bingham).

Unlike many other emergency powers that become available pursuant to national emergency declarations, Congress chose to include in IEEPA additional requirements beyond those required in the NEA. Under IEEPA, a president must declare that the national emergency is based on an "unusual and extraordinary threat" to the U.S. national security, foreign policy, or economy "which has its source in whole or substantial part outside the United States."  50 U.S.C. § 1701(a). In addition, Congress required a new declaration of national emergency invoking

IEEPA for each "new threat", 50 U.S.C. § 1701(b), and included additional consultation and reporting mechanisms. 50 U.S.C. § 1703.

The Carter administration ultimately was supportive of the additional checks and constraints contained in IEEPA, and engaged with Congress on TWEA's revisions, although it did raise questions regarding the constitutionality of the legislative veto mechanism (which at the time was employed by a number of statutes). A U.S. Department of Treasury official testified:

> The administration also supports the requirement of section 202 which states that a national emergency for purposes of this International Emergency Economic Powers Act must be based on an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States. We believe that this approach emphasizes that such powers should be available only in true emergencies, a view which we most certainly share.

*Revision of Trading With the Enemy Act: Hearing Before the H. Comm. on Int'l Relations*, 95th Cong. 12 (1977) (statement of Hon. C. Fred Bergsten).

In a signing statement, President Carter wrote that "H.R. 7738 is the result of a cooperative effort by the Congress and this administration. … It places additional constraints on use of the President's emergency economic powers in future national emergencies and ensures that the Congress and the public will be kept informed of activities carried out under these powers." Jimmy Carter, *Presidential War Powers Bill Statement on Signing H.R. 7738 Into Law*, American Presidency Project (Dec. 28, 1977), https://tinyurl.com/y6cphcez. As mentioned above, subsequent to IEEPA's passage, the U.S. Supreme Court ruled the NEA's legislative veto provision (which applied to IEEPA declarations) unconstitutional, and it was replaced with a joint resolution mechanism.

In short, the legislative history of IEEPA, like that of the NEA, reflects a clear intent to limit the president's use of emergency powers. Moreover, when read in the context of the NEA's legislative history, IEEPA's substantive requirements for declaring a national emergency take on

14

added significance. In passing the NEA, Congress consciously left it to the individual statutory

powers—like IEEPA—to fulfill the critical task of defining what constitutes an emergency. IEEPA

includes such a definition; to honor the congressional intent behind the NEA framework, that

definition must be scrupulously applied.

### a. Background to the Informational Materials Exemption

Although for brevity and consistency Amicus refers to the exemption contained at 50 U.S.C.

§ 1702(b)(3) as the "informational materials" exemption—its common denomination—this

moniker captures only some of what is covered by the exemption. As plainly stated by the

statutory language, the exemption covers "any *information* or informational materials." 50

U.S.C. § 1702(b)(3) (emphasis added). The exemption in its current form states:

> **Exceptions to Grant of Authority** The authority granted to the President by this
> section does not include the authority to regulate or prohibit, directly or
> indirectly— … the importation from any country, or the exportation to any
> country, whether commercial or otherwise, regardless of format or medium of
> transmission, of any information or informational materials, including but not
> limited to, publications, films, posters, phonograph records, photographs,
> microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire
> feeds. The exports exempted from regulation or prohibition by this paragraph do
> not include those which are otherwise controlled for export under section 4604 of
> this title, or under section 4605 of this title to the extent that such controls promote
> the nonproliferation or antiterrorism policies of the United States, or with respect
> to which acts are prohibited by chapter 37 of title 18[.]

50 U.S.C. § 1702(b)(3).

Although IEEPA, as originally enacted, did contain an exception for "any postal, telegraphic,

telephonic, or other personal communication, which does not involve a transfer of anything of

value," 50 U.S.C. § 1702(b)(1), it did not explicitly carve out an exception for other materials

protected by the First Amendment's free speech guarantees. Indeed, IEEPA's legislative history

demonstrates that Congress believed the very existence of the First Amendment would be

sufficient to protect other free speech interests. While IEEPA was under consideration, Congress

deleted from the bill a provision that would have protected "collection and dissemination of news by the news media." In removing that exception, the committee explained: "The committee does not intend by this deletion to authorize regulation or prohibition of the collection and dissemination of news. The news media have long maintained that the First Amendment to the Constitution provides adequate and complete protection of freedom of the press, and the committee, therefore, considered further statutory protection of that freedom unnecessary, redundant, and inappropriate." H.R. Rep. No. 95-459, at 15-16 (1977).

In the 1980s, however, Congress grew concerned with some of the actions the government was taking to enforce sanctions, and realized it needed to further protect free speech within IEEPA. Among other actions, authorities had been seizing books and magazines shipped from countries sanctioned under IEEPA or TWEA. *See Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003). In 1988, Representative Howard Berman introduced, as part of the 1988 Omnibus Trade and Competitiveness Act, what came to be known as the Berman Amendment. Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, § 2502, 102 Stat. 1107 (1988).[6] The amendment carved out from IEEPA (and from TWEA) the President's "authority to regulate or prohibit, directly or indirectly, the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials." Omnibus

---

[6] Speaking in support of a predecessor of the Berman Amendment in 1986, Senator Mathias exhorted: "Abstract ideals such as freedom of speech are promoted and articulated in tangible forms and concrete actions. If we deny citizens the right to travel, or hear the views and opinions of others, th[e]n we trample on this ideal. Diversity, dialog, and exchange of ideas are the life-giving elements—the water and air—of American tradition; exclusion, restriction, repression of ideas are the features of far more troubled, less confident nations. As President Reagan has said: Expanding contacts across borders and permitting a free exchange or interchange of information and ideas increase confidence; sealing off one's people from the rest of the world reduce it." 132 Cong. Rec. S3707-04 (1986) (statement of Sen. Mathias).

Trade and Competitiveness Act of 1988, Pub. L. No. 100-418 § 2502, 102 Stat. 1107, 1371-72 (1988).

As described shortly, Congress would feel compelled to expand, strengthen, and clarify this exception in a few short years, but even before that augmentation a federal court had the opportunity to recognize the breadth of what the Berman Amendment protected. In rejecting a government claim that the informational materials exemption under TWEA did not apply to artwork, the court in *Cernuda v. Heavey* looked to the most relevant legislative history available,[7] a House Committee on Foreign Affairs report, which stated:

> The committee notes that the American Bar Association House of Delegates approved, in February 1985, the principle that no prohibitions should exist on imports to the United States of ideas and information if their circulation is protected by the First Amendment. That principle applies with equal force to the exportation of ideas and information from this country to the rest of the world. Accordingly, these sections also exempt informational materials and publications from the export restrictions that may be imposed under these acts.

*Cernuda*, 720 F.Supp. 1544, 1548 (S.D. Fla. 1989) (quoting H.R. Rep. No. 100-40, pt. 3, at 113 (1987)).

In *Cernuda*, the government argued that the informational materials exception did not extend to all materials protected by the First Amendment. The court observed that this argument "seems to ignore the plain language of the [ABA] report and the obvious First Amendment orientation of the words 'informational materials.'" *Cernuda*, 720 F.Supp. at 1550. In ruling against the government, the court held that the "statutory construction and the legislative history of the 1988 TWEA amendment show that Congress amended the TWEA to exempt 'informational

---

[7] The court found a near void of direct legislative history for the 1988 amendment, and thus looked to legislative history for the Berman Amendment's legislative predecessor that had failed because of an unrelated provision. See *Cernuda v. Heavey,* 720 F.Supp. 1544, 1547-1548 (S.D. Fla. 1989) ("the 1988 act specifically provides that the legislative history for the predecessor bill, H.R. 3, generally is treated as its own legislative history").

materials,' in order to prevent the statute from running afoul of the First Amendment." *Cernuda*, 720 F.Supp. at 1553. The government did not appeal.

Other courts, however, upheld some of the Treasury Department's narrow interpretations of the Berman Amendment. *See, e.g., Capital Cities/ABC, Inc. v. Brady,* 740 F.Supp. 1007 (S.D.N.Y. 1990) (deferring to government interpretation of Berman Amendment that excluded broadcasts). Such narrow readings included a claimed right to regulate transactions related to "informational materials not fully created and in existence at the date of the transaction," those regarding "the substantive or artistic alteration or enhancement of informational materials," and "intangible items, such as telecommunications transmissions." *See, e.g.,* Foreign Assets Control Regulations and Cuban Assets Control Regulations, 54 Fed. Reg. 5229 (Feb. 2, 1989).

These cramped interpretations prompted Congress to amend IEEPA again in 1994 with the Free Trade in Ideas Act (FTIA), creating the "informational materials" exemption as it is today. *See Kalantari*, 352 F.3d at 1205. The FTIA clarified the expansive reach of the informational materials exemption in both the IEEPA and TWEA through a number of changes. It stated that the exemption applied not only to "informational materials" but also "information"; it stated that the exemption applied "regardless of format or medium of transmission"; and it made clear that the list of exempted media (to which the FTIA added new examples) was only illustrative by prefacing that list with the words "including but not limited to."[8] Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, § 525, 108 Stat 382, 474 (1994).

---

[8] The passage of the 1994 amendment augmenting and reaffirming the broad protections of the informational materials exemption significantly undermines any reliance on IEEPA cases that preceded this amendment and that read the exemption narrowly, such as *Walsh v. Brady*, 927 F.2d 1229, 1233 (D.C. Cir. 1991).

The congressional conference report to the FTIA reiterated that the Berman Amendment was meant to protect free speech under the First Amendment, and explained that the FTIA was meant to remedy narrow governmental interpretations of that amendment:

> [T]he Berman Amendment to the Omnibus Trade and Competitiveness Act … established that no embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment to the U.S. Constitution. The language was explicitly intended, by including the words 'directly or indirectly,' to have a broad scope. However, the Treasury Department has narrowly and restrictively interpreted the language in ways not originally intended.

> H.R. Conf. Rep. 103-482, at 239 (1994).

The report noted that the 1994 amendment was addressing only some of the unintended restrictions without providing a comprehensive list of which restrictions those were. *Id.* However, in addition to affirming that the Berman Amendment was meant to protect First Amendment activities at the outset, the report also explained that the 1994 amendment was intended to protect a penumbra of activity around those exempted activities, including activities leading to their creation:

> The committee of conference intends these amendments to facilitate transactions and activities incident to the flow of information and informational materials without regard to the type of information, its format, or means of transmission, and electronically transmitted information, transactions for which must normally be entered into in advance of the information's creation.

> The committee of conference further understands that it was not necessary to include any explicit reference in the statutory language to "transactions incident" to the importation or exportation of information or informational materials, because the conferees believe that such transactions are covered by the statutory language.

H.R. Conf. Rep. 103-482, at 239 (1994).

Even after the passage of the 1994 amendment, however, OFAC has continued to interpret the informational materials exemption in ways that run counter to Congress's intent to robustly protect free speech and related activities. For instance, some OFAC regulations continue to aver that the

informational materials exemption does not apply to "transactions related to information and informational materials not fully created and in existence at the date of the transactions, or ... the substantive or artistic alteration or enhancement of informational materials, or ... the provision of marketing and business consulting services ... [or] services to market, produce or co-produce, create or assist in the creation of information and informational materials." *See, e.g.,* Iranian Transactions and Sanctions Regulations, 31 C.F.R. § 560.210(c)(2); Cuban Assets Control Regulations, 31 C.F.R. § 515.206.

### b.  Applicable Scope of the Informational Materials Exemption

Plaintiffs' desire to transfer information to, and receive information from, the International Criminal Court, including by submitting amicus briefs or presenting on topics such as the protection of children, would clearly be protected by the informational materials exemption. The informational materials exemption is contained in IEEPA itself, and therefore it applies to the ICC sanctions regime established by Executive Order 13928 even though it is not explicitly addressed in either the executive order or the implementing regulations. Moreover, because the implementing regulations do not address the informational materials exemption, they also do not make any claims to limit the exemption in regard to materials "not fully created and in existence at the date of the transactions" or otherwise, as some IEEPA regulations do.

To the extent the government believes the executive order and implementing regulations would not permit the information exchanges Plaintiffs contemplate, such a result would be inconsistent with the letter and intent of the statute. *See, e.g., N.Y.C. Health and Hosp. Corp. v. Perales*, 954 F.2d 854, 858 (2d Cir. 1992) (refusing to defer to agency interpretation when it was "at odds with the clear intent of the statutes, both facially and as elaborated by legislative history."); *Chen v. B.I.A.,* 164 F. Supp. 3d 612, 620 (S.D.N.Y. 2016) (court may not uphold agency interpretation that is manifestly contrary to the statute) (citing *Adams v. Holder*, 692 F.3d

91, 95 (2d Cir. 2012)). As already described, Congress has repeatedly evidenced its intent that IEEPA not be used to regulate First Amendment free speech activities. "The Berman Amendment was designed to prevent the executive branch from restricting the international flow of materials protected by the First Amendment." *Kalantari*, 352 F.3d at 1204 (citing *Capital Cities/ABC, Inc. v. Brady*, 740 F.Supp. 1007, 1009 (S.D.N.Y. 1990)). "Congress has stressed that [the informational materials exemption] be given 'broad scope.'" *TikTok Inc. v. Trump*, No. 1:20-cv-02658 CJN, 2020 WL 5763634, at *4 (D.D.C. Sept. 27, 2020).

Significantly, unlike IEEPA's exemption for humanitarian donations, 50 U.S.C. § 1702(b)(2), Congress did not provide for waiver of the informational materials exemption under any circumstances. Moreover, by stating clearly within the exemption the narrow areas of information and informational materials not encompassed by it—certain items controlled for export and that relate to nonproliferation, espionage, and anti-terrorism—it indicated that other limitations were not cognizable. *See TRW Inc. v. Andrews*, 534 U.S. 19, 20 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

In sum, to construe the informational materials exemption in a crabbed manner—as would be necessary to interpret the executive order and implementing regulations to prohibit informational exchanges between Plaintiffs and ICC staff—would be flatly contrary to the statute's language and legislative history.[9]

---

[9] Although Amicus is focused here on the informational materials exemption given that Plaintiffs have made an *ultra vires* claim in that regard, we note that some actions Plaintiffs state they wish to engage in may also be covered by IEEPA's personal communications exemption or travel exemption. 50 U.S.C. §§ 1702(1), (4).

### III.   Robust Judicial Review is Imperative

In recent litigation concerning IEEPA-based sanctions, the government has argued that the President's decisions under IEEPA are entitled to "maximum judicial deference." Defendants' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj., at *5, *TikTok Inc. v. Trump*, No. 1:20-cv-02658 CJN (D.D.C. Sept. 25, 2020).  President Trump, when pressed on his claimed authority to prohibit all U.S. businesses from operating in China, tweeted "try looking at the Emergency Economic Powers Act of 1977. Case closed!" President Donald J. Trump (@realDonaldTrump), Twitter (Aug. 23, 2019, 11:58 PM), https://tinyurl.com/y62val2x. But, as explained above, such an approach would be contrary to Congress's intent in cabining emergency powers under the NEA and IEEPA, and in protecting free speech within IEEPA.

Rather than deserving deference, the potential for a president's abuse of emergency powers requires exacting judicial scrutiny. As the U.S. Court of Appeals for the Ninth Circuit recently held in rejecting the government's claim that the use of emergency powers to fund a border wall was unreviewable:

> [J]udicial review of statutes conferring specific emergency powers to the President is critical … Were we to conclude that judicial review of such a statute was precluded, the President's emergency authority would be effectively unbounded, contravening the purpose of the NEA. Thus, the language of [the law] is not only susceptible to judicial review, but its statutory context requires it.

*Sierra Club v. Trump*, No. 19-17501, No. 19-17502, No. 20-15044, 2020 WL 5989377, at

*19 (9th Cir.).

In *Sierra Club*, the Ninth Circuit stringently parsed the enabling language of the relevant statutory emergency power, explaining that to interpret the terms broadly "would run afoul … of the NEA, which was passed to ensure that the powers now in the hands of the Executive will be utilized only in time of genuine emergency and then only under safeguards providing for Congressional review."  *See Sierra Club*, 2020 WL 5989377, at *23 (internal punctuation

omitted); *see also id.* at *22 (holding that construing emergency power "broadly would also be contrary to the purpose of the statutory scheme of which [the power] is a part—the NEA" because "the National Emergencies Act is not intended to enlarge or add to Executive power" (internal punctuation omitted)).

Following the Supreme Court's elimination of the NEA's legislative veto in *Chadha*, *i.e.,* Congress's most potent tool to halt emergency powers abuses, courts' role as a backstop to abuses of emergency powers became even more crucial. Even when a majority of Congress opposes a use of emergency powers, it cannot play that role. For instance, Congress has twice voted to terminate the emergency President Trump declared to fund the construction of a border wall, and the President has both times vetoed that termination. *See Sierra Club*, 2020 WL 5989377 at *1; *see also id* at *4 ("Chadha, therefore, made it more difficult for Congress to check the President's use of emergency powers than originally intended."). Significantly, the Supreme Court's decision in *Dames & Moore v. Regan*, 453 U.S. 654 (1981), often cited as an endorsement of judicial deference to the president's exercise of powers under IEEPA, predated both the inclusion of the travel and informational materials exemptions and the elimination of the legislative veto.

Recently, federal courts have been particularly skeptical of this administration's unprecedented uses of IEEPA, particularly where those uses implicate free speech. In September, a judge granted a preliminary injunction against IEEPA sanctions targeted at the Chinese-owned app TikTok because he found the regulated activity fell within the informational materials and personal communications exemptions. *TikTok Inc.,* 2020 WL 576364, at *5-7. There, the government contended that the "plain-language" view of the informational materials exemption

could not possibly be correct because it would create "an IEEPA-free zone." *Id.* at *6.  The judge rejected this argument, stating "it does not find support in the text of the statute." *Id.*

In October, a second judge granted a preliminary injunction against the TikTok sanctions based on the informational materials exemption. *Marland v. Trump*, No. 90-346 (E.D.Pa. Oct. 30, 2020) (order granting preliminary injunction). In *Marland*, the judge rejected the government's argument that the exemption should be read narrowly as "clearly incorrect," *id.* at *15, concluding: "The Government urges that a ruling finding the [sanctions] violative of IEEPA will create an 'IEEPA-free zone,' unduly restricting the President's ability to respond to national security threats. But Congress itself, in enacting the Berman Amendment, created an 'IEEPA-free zone'." *Id.* at 21.

A judge also granted a preliminary injunction against IEEPA sanctions targeting the app WeChat; in September the judge found that the government's action was not sufficiently narrowly tailored and therefore likely violated the First Amendment rights of people in the United States who use the app. *U.S. WeChat Users All. v. Trump*, No. 20-cv-05910-LB, 2020 WL 5592848, at *10 (N.D. Cal. Sept. 19, 2020) (order granting preliminary injunction); *stay denied,* Order Denying Mot. to Stay, No. 20-cv-05910 (N.D. Cal. Oct. 23, 2020), *stay denied*, Order, No. 20-16908 (9th Cir. Oct. 26, 2020).

Like other courts that recently have reviewed this administration's exercise of emergency powers, this court has an essential role in ensuring that the executive acts within the bounds of the law. "For all 'its defects, delays and inconveniences,' it remains critical in all areas, but particularly with respect to the emergency powers, that 'the Executive be under the law, and that the law be made by parliamentary deliberations.'" *Sierra Club*, 2020 WL 5989377, at *19 (quoting *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring)).

24

## CONCLUSION

Couched within two layers of statutes meant to significantly limit Presidential abuse of emergency powers—the NEA and IEEPA—Congress carved out a broad, unwaivable exemption from the use of those powers in order to protect First Amendment free speech interests. The limitations on executive authority contained within these statutes are not merely suggestions or preferences. They are essential guardrails that Congress implemented after multiple experiences with executive abuse of emergency powers.

As the Ninth Circuit recently reiterated  "'Presidential powers are not fixed but fluctuate, depending on their disjunction or conjunction with those of  Congress,' and '[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Sierra Club*, 2020 WL 5989377, at *23 (quoting *Youngstown*, 343 U.S. at 635, 637 (Jackson, J., concurring)). Congress's intent to prohibit the use of IEEPA to prevent information exchanges like those Plaintiffs wish to undertake is manifest, and the government's actions should be enjoined.

Respectfully submitted,

Dated: November 3, 2020                                       Respectfully submitted,

*/s/ Andrew Boyle*
Andrew Boyle
(admission *pro hac vice* pending)
Brennan Center for Justice
1140 Connecticut Ave., NW
Suite 1150
Washington, D.C. 20036
(202) 280-4524
Andrew.Boyle@nyu.edu

*Counsel for Amicus Curiae Brennan Center for Justice*