**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OPEN SOCIETY JUSTICE INITIATIVE; DIANE MARIE AMANN; MILENA STERIO; MARGARET DEGUZMAN; GABOR RONA,<br><br>                 Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, President of the United States; UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, Secretary of State; UNITED STATES DEPARTMENT OF THE TREASURY; STEVEN T. MNUCHIN, Secretary of the Treasury; UNITED STATES DEPARTMENT OF JUSTICE; WILLIAM P. BARR, United States Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; ANDREA M. GACKI, Director of the Office of Foreign Assets Control,<br><br>                 Defendants. | Civil Action No. 1:20-cv-08121-KPF |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

    I.       The International Criminal Court............................................................................1

    II.     Plaintiffs' Interactions with the International Criminal Court ................................3

    III.   The Executive Order and Regulations ...................................................................6

    IV.   Plaintiffs' Response to the Executive Order ...........................................................9

ARGUMENT ..................................................................................................................... 10

    I.       Plaintiffs Are Likely to Succeed on the Merits.....................................................10

         A.     The Restrictions on Plaintiffs' Speech Violate the First Amendment .......11

         B.     The Executive Order and Regulations Are Unconstitutionally Vague ......15

         C.     The Executive Order and Regulations Are Ultra Vires Under IEEPA ......22

    II.     The Executive Order Is Causing Irreparable Harm to Plaintiffs............................23

    III.   The Balance of the Equities and Public Interest Favor Relief ...............................24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*33 Seminary LLC v. City of Binghamton*
 120 F. Supp. 3d 223 (N.D.N.Y. 2015) ................................................................................ 21

*Al Haramain Islamic Foundation v. Department of the Treasury*
 686 F.3d 965 (9th Cir. 2011) ................................................................................... 14, 15

*Alexander v. United States*
 509 U.S. 544 (1993) ................................................................................................ 13

*Am. Civil Liberties Union v. Ashcroft*
 322 F.3d 240 (3d Cir. 2003) ...................................................................................... 24

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*
 564 U. S. 721 (2011) ............................................................................................... 12

*Arriaga v. Mukasey*
 521 F.3d 219 (2d Cir. 2008) ...................................................................................... 19

*Ayvaz v. Holder*
 564 Fed. Appx. 625 (2d Cir. 2014) .............................................................................. 22

*Bronx Household of Faith v. Bd. of Educ.*
 331 F.3d 342 (2d Cir. 2003) ...................................................................................... 24

*Brown v. Entertainment Merchs. Ass'n*
 564 U.S. 786 (2011) ........................................................................................... 13, 15

*Doe v. Snyder*
 101 F. Supp. 3d 672 (E.D. Mich. 2012) ......................................................................... 19

*Eclipse Enters. v. Gulotta*
 134 F.3d 63 (2d Cir. 1997) ....................................................................................... 11

*Elrod v. Burns*
 427 U.S. 347 (1976) ................................................................................................ 24

*Evergreen Ass'n v. City of New York*
 740 F.3d 233 (2d Cir. 2014) ...................................................................................... 24

*FCC v. Fox TV Stations, Inc.*
 567 U.S. 239 (2012) ................................................................................................ 16

*Google LLC v. United States*
 443 F. Supp. 3d 447 (S.D.N.Y. 2020) ........................................................................... 13

*Grayned v. City of Rockford*
 408 U.S. 104 (1972) ............................................................................................... 16

*Hoffman Estates v. Flipside, Hoffman Estates*
 455 U.S. 489 (1982) ............................................................................................... 16

*Holder v. Humanitarian Law Project*
 561 U.S. 1 (2010) ............................................................................................ 11, 20

*Krukowski v. Swords*
 15 F. Supp. 2d 188 (D. Conn. 1998) ...................................................................... 16

*Lanzetta v. New Jersey*
 306 U.S. 451 (1939) ............................................................................................... 17

*Make the Rd. by Walking, Inc. v. Turner*
 378 F.3d 133 (2d Cir. 2004) .................................................................................. 12

*N.Y. Progress & Prot. PAC v. Walsh*
 733 F.3d 483 (2d Cir. 2013) .................................................................................. 24

*Nichols v. Village of Pelham Manor*
 974 F. Supp. 243 (S.D.N.Y. 1997) ........................................................................ 16

*Oneida Nation of N.Y. v. Cuomo*
 645 F.3d 154 (2d Cir. 2011) .................................................................................. 10

*Police Department of Chicago v. Mosley*
 408 U.S. 92 (1972) ................................................................................................. 11

*Ragbir v. Homan*
 923 F.3d 53 (2d Cir. 2019) .................................................................................... 12

*Record Revolution No. 6 v. Parma*
 638 F.2d 916 (6th Cir. 1980) ................................................................................. 17

*Reed v. Town of Gilbert*
 576 U.S. 155 (2015) .......................................................................................... 11, 12

*Republican Party v. White*
 536 U.S. 765 (2002) ............................................................................................... 15

*Rosenberger v. Rector and Visitors of Univ. of Va.*
 515 U.S. 819 (1995) .......................................................................................... 12, 13

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*
 502 U.S. 105 (1991) ............................................................................................... 13

*Singh-Kaur v. Ashcroft*
    385 F.3d 293 (3d Cir. 2004) ........................................................... 22

*TikTok v. Trump*
    2020 U.S. Dist. LEXIS 177250 (D.D.C. Sept. 27, 2020) ..................... 23

*Travis v. Owego-Apalachin School Dist.*
    927 F.2d 688 (2d Cir. 2011) ........................................................... 12

*United States v. Playboy Entm't Group*
    529 U.S. 803 (2000) ..................................................................... 13

*United States v. Schulte*
    436 F. Supp. 3d 747 (S.D.N.Y. 2020) ............................................. 16

*United States v. Williams*
    553 U.S. 285 (2008) ..................................................................... 16

*VIP of Berlin, LLC v. Town of Berlin*
    593 F.3d 179 (2d Cir. 2010) ........................................................... 16

*Winter v. NRDC, Inc.*
    555 U.S. 7 (2008) ......................................................................... 10

**Statutes**

50 U.S.C. § 1701 ................................................................................. 6

50 U.S.C. § 1701(a) ............................................................................ 6

50 U.S.C. § 1702(a)(1)(B) .................................................................... 7

50 U.S.C. § 1705 .............................................................................. 7, 8

50 U.S.C. §§ 1702(b)(3) ................................................................... 7, 23

**Regulations**

31 C.F.R. § 510.101 ........................................................................... 17

31 C.F.R. § 510.310 ........................................................................... 18

31 C.F.R. § 510.326 ........................................................................... 18

31 C.F.R. § 520.201 ............................................................................. 8

31 C.F.R. § 520.201(a) ........................................................................ 13

31 C.F.R. § 520.202 ......................................................................... 7, 11

31 C.F.R. § 520.310 ................................................................................................ 7, 11

31 C.F.R. § 520.311 ................................................................................................ 7, 11

31 C.F.R. § 520.701 .................................................................................................... 7

31 C.F.R. § 536.101 .............................................................................................. 17, 19

31 C.F.R. § 536.304 .................................................................................................. 18

31 C.F.R. § 536.406 .................................................................................................. 20

31 C.F.R. § 594.101 .................................................................................................. 19

31 C.F.R. § 594.406 .................................................................................................. 19

85 F.R. 19884 (2020) .................................................................................................. 7

## Other Authorities

108 Stat. 382, § 525(c)(3) (1994) ............................................................................ 23

Executive Order 13,928,
   *Blocking Property of Certain Persons Associated*
   *With the International Criminal Court* ................................................ 7, 8, 14, 19

H.R. Conf. Rep. No. 103-482 (1994) ........................................................................ 23

## INTRODUCTION

Executive Order 13,928, *Blocking Property of Certain Persons Associated With the International Criminal Court* (the "Executive Order" or the "Order"), issued by President Donald J. Trump on June 11, 2020, and its implementing regulations, 31 C.F.R. § 520.101 *et seq.* (the "Regulations"), threaten to impose financially ruinous sanctions, monetary penalties, and incarceration on Plaintiff Open Society Justice Initiative ("OSJI"), a public interest law center, and Plaintiffs Diane Marie Amann, Margaret deGuzman, Milena Sterio, and Gabor Rona, all professors of law (collectively, "Plaintiffs"), for providing education, advice, training, and other assistance to senior officials of the International Criminal Court ("ICC" or the "Court") in aid of the Court's investigation and prosecution of war crimes, crimes against humanity, and genocide.

The Executive Order and Regulations should be preliminarily enjoined as to Plaintiffs. They violate the First Amendment to the U.S. Constitution by prohibiting speech based on content and viewpoint without being narrowly tailored to serve any compelling government interest. Contrary to the Fifth Amendment, key provisions are so vague that they fail to provide notice as to whom they cover and what they prohibit. The Executive Order and Regulations are also *ultra vires* under their governing statute. Plaintiffs are irreparably harmed by the deprivation of their right to free speech. The balance of equities and the public interest weigh decisively in favor of a preliminary injunction.

## BACKGROUND

### I.    The International Criminal Court

The ICC is a permanent court, based in The Hague, The Netherlands. It was created by a treaty, the Rome Statute of the International Criminal Court (the "Rome Statute"), which currently has 123 States Parties from every region of the world. The ICC may exercise jurisdiction over the investigation and prosecution of individuals accused of serious international

crimes, including war crimes, crimes against humanity, and genocide, but only if the State where the alleged crimes would ordinarily be investigated and prosecuted is unwilling or unable to do so.  Rome Statute, arts. 5, 17.  States that ratify or accede to the Rome Statute consent to the ICC's investigation and prosecution of crimes within the Court's jurisdiction that are alleged to have occurred on their territory or are alleged to have been committed by their nationals.  *Id*. art. 13.  The ICC may also exercise jurisdiction where the UN Security Council refers a situation to the Court.  *Id.*  The ICC has no independent enforcement power and relies on States to arrest individuals who are named in its arrest warrants.  *Id*. art. 59.

Within the ICC, the Office of the Prosecutor is responsible for investigating and prosecuting individuals allegedly responsible for committing crimes within the Court's jurisdiction.  Ms. Fatou Bensouda is the Prosecutor of the ICC and the head of the Office of the Prosecutor.  Mr. Phakiso Mochochoko is the head of the Office of the Prosecutor's Jurisdiction, Complementarity and Cooperation Division.

Although the United States is not a party to the Rome Statute, it has supported numerous investigations and prosecutions by the ICC.  For example:

- The Democratic Republic of the Congo (a State Party to the Rome Statute) referred the situation in its territory to the ICC.  The U.S. Department of State later "welcome[d] the removal of one of the most notorious and brutal rebels in the Democratic Republic of the Congo . . . to the International Criminal Court" and praised the United States' "key role in the surrender" of that accused war criminal "to the ICC."  Decl. of Nicholas M. Renzler, Exs. 1 & 2.

- The Central African Republic (a State Party to the Rome Statute) referred to the ICC alleged international crimes that occurred in its territory, including mass rapes and killings.  The U.S. Department of State expressed support for "the ICC's investigations in the Central African Republic" and "commend[ed]" its "commitment to ensuring accountability for serious crimes, including through its cooperation with the ICC."  *Id*., Ex. 3.

- The UN Security Council (of which the U.S. is a permanent member) adopted Resolution 1593, which referred the situation in the Darfur region of Sudan (which is

2

not a State Party to the Rome Statute) to the ICC. The U.S. Department of State stated that it "fully support[s] bringing to justice those responsible for crimes and atrocities" that "occurred in Darfur" and "call[ed] upon the Sudanese Government to cooperate fully with the ICC under the aegis of UN Security Council Resolution 1593." *Id.*, Ex. 4.

- The UN Security Council adopted Resolution 1970, which referred the situation in Libya (which is not a State Party to the Rome Statute) to the ICC. The United States stated that the unanimous referral to the ICC by "the Council reflected the importance that the international community attaches to ensuring that those responsible for the widespread and systematic attacks against the Libyan people are held accountable" and that it "welcomes the swift and thorough work of the Prosecutor." *Id.*, Ex. 5.

- Mali (which is a State Party to the Rome Statute) referred the situation regarding alleged international crimes occurring in its territory to the ICC. The U.S. Department of State stated that "[t]he United States supports efforts by the ICC and Malian authorities to provide justice for these serious crimes committed in Mali" and that "[w]e commend Mali for its cooperation with the ICC in this matter." *Id.*, Ex. 6.

In 2020, the ICC's Appeals Chamber authorized an investigation into crimes allegedly committed in Afghanistan (a State Party to the Rome Statute), including those allegedly committed by the Taliban, Afghan security forces, and U.S. personnel. *Id.*, Ex. 7 ¶ 4.

## II.     Plaintiffs' Interactions with the International Criminal Court

Prior to the Executive Order, Plaintiffs provided education, training, advice, and other forms of assistance to the Office of the Prosecutor, including to Ms. Bensouda and Mr. Mochochoko.

**Plaintiff OSJI** is a public interest law center, based in the United States, that is dedicated to upholding human rights and the rule of law through litigation, advocacy, research, and technical assistance. Decl. of James A. Goldston ¶ 2. It undertakes a range of activities to promote international justice and accountability in a variety of locations outside the United States including, *inter alia*, The Netherlands and the United Kingdom. *Id.*

Prior to the Executive Order, Plaintiff OSJI, among other things:

- Provided assistance to the Office of the Prosecutor on how it might use emerging technologies to analyze evidence of international crimes, including by bringing together experts in the fields of information technology and forensics with staff from the Office of the Prosecutor and supporting the establishment and operationalization of a technical advisory board. *Id.* ¶ 3.

- Met with staff from the Office of the Prosecutor to assist in improving the ICC's communications with a view to strengthening its effectiveness and public support. *Id.* ¶ 4.

- Co-organized an online workshop, attended by staff of the Office of the Prosecutor, that addressed strategies for improving the performance of the Office of the Prosecutor, including with respect to investigations and prosecutions. *Id.* ¶ 5.

- Met with the Office of the Prosecutor approximately 5-15 times per year, including 2-4 calls or meetings per year with Ms. Bensouda. *Id.* ¶ 6.

**Plaintiff Amann** is the Emily and Ernest Woodruff Chair in International Law and Faculty Co-Director of the Dean Rusk International Law Center at the University of Georgia School of Law. Decl. of Diane Marie Amann ¶ 2. Plaintiff Amann is a citizen of the United States and Ireland. *Id.* ¶ 4.

In 2012, Plaintiff Amann was appointed by Ms. Bensouda to serve as the Special Adviser to the ICC Prosecutor on Children in and affected by Armed Conflict. *Id.* ¶ 5. In that capacity, Plaintiff Amann assisted in the preparation of the Office of the Prosecutor's *Policy on Children.* *Id.* ¶ 6. The objectives of the *Policy* include "[e]nsur[ing] that staff interact with children sensitively and with due respect for their best interests and rights under international law" and promoting "good practices in relation to the protection of rights of children." *Id.*, Ex. 1 at p. 9. This entails, among other things:

- Ensuring that the Office of the Prosecutor pays particular attention to crimes against or affecting children, including, *inter alia*, the recruitment and use of child soldiers, the torture of children, the trafficking of children as enslavement, and the commission of rape and other forms of sexual and gender-based crimes against children; and

4

- In regard to child victims and witnesses, seeking to "avoid exposing children to risks, including of re-traumatisation, and causing undue disruptions to their lives as a result of their cooperation" with the Office of the Prosecutor.  *Id*., Ex. 1 ¶¶ 19, 75.

Since 2012, and until the designation of Ms. Bensouda and Mr. Mochochoko under the Executive Order, Plaintiff Amann provided the Office of the Prosecutor, including Ms. Bensouda, with education, advice, training, and other assistance on matters relating to children and armed conflict.  *Id*. ¶ 6.

**Plaintiff Sterio** is the Charles R. Emrick Jr. – Calfee Halter & Griswold Professor of Law at the Cleveland-Marshall College of Law.  Decl. of Milena Sterio ¶ 2.  She is a citizen of the United States and Serbia.  *Id.* ¶ 4.  Prior to the Executive Order, Plaintiff Sterio: (a) based on consultations with the Office of the Prosecutor, directed student research concerning the investigation and prosecution of international crimes, including the ICC's investigation into the situation in Darfur, which she submitted to the Office of the Prosecutor; (b) submitted an *amicus curiae* brief to the ICC; and (c) delivered presentations attended by Office of the Prosecutor staff that she intended to provide education, advice, training, and assistance to the Office of the Prosecutor, including to Ms. Bensouda and Mr. Mochochoko.  *Id*. ¶¶ 5-6.

**Plaintiff deGuzman** is a James E. Beasley Professor of Law and Co-Director of the Institute for International Law and Public Policy at Temple University's Beasley School of Law. Decl. of Margaret deGuzman ¶ 2.  She is a citizen of the United States and Canada.  *Id.* ¶ 4. Prior to the Executive Order, Plaintiff deGuzman submitted to the ICC *amicus curiae* briefs supportive of positions advanced by the Office of the Prosecutor, including Ms. Bensouda and Mr. Mochochoko, including a brief in regard to the prosecution of former Sudanese President Omar Al Bashir.  *Id*. ¶ 5.  In addition, Plaintiff deGuzman: (a) gave presentations at the ICC and/or attended by staff of the Office of the Prosecutor on issues concerning, among other things,

case selection and prosecutorial discretion, through which she intended to educate, advise, train, and otherwise provide assistance to the Office of the Prosecutor, including Ms. Bensouda and Mr. Mochochoko; and (b) published *Shocking the Conscience of Humanity: Gravity and the Legitimacy of International Criminal Law*, as well as other academic works, and made media appearances, supportive of the Office of the Prosecutor, including Ms. Bensouda and Mr. Mochochoko, through which she intended to provide them with education, advice, training, and otherwise to provide them with assistance.  *Id.* ¶¶ 6-7.

**Plaintiff Rona** is Professor of Practice at Cardozo School of Law and Director of the Law and Armed Conflict Project at the Cardozo Law Institute in Holocaust and Human Rights. Decl. of Gabor Rona ¶ 2.  He is a citizen of the United States and Hungary.  *Id.* ¶ 4.  Prior to the Executive Order, Plaintiff Rona submitted an *amicus curiae* brief to the ICC in support of the position of the Office of the Prosecutor, including Ms. Bensouda and Mr. Mochochoko, that the ICC may exercise jurisdiction over alleged crimes committed in relation to the situation in Afghanistan in cases where those crimes occurred in third countries that are States Parties to the Rome Statute.  *Id.* ¶ 5.

### III.    The Executive Order and Regulations

The Executive Order purports to be authorized by the International Economic Emergency Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.*  IEEPA grants the President certain powers once the President has declared a national emergency with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a). When the President has declared such an emergency, the President may:

> block . . . regulate . . . void, prevent or prohibit, any acquisition, holding, withholding, use transfer, withdrawal, . . . dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in

which any foreign country or a national thereof has any interest by any person, or
with respect to any property, subject to the jurisdiction of the United States.

*Id*. § 1702(a)(1)(B).  The President, however, may not "regulate or prohibit, directly or

indirectly" the importation or exportation, "regardless of format or medium of transmission, of

any information or informational materials."  *Id*. § 1702(b)(3).

The President, or an agency to which such power is delegated, may "designate" persons

whose property or interests in property are subject to the restrictions set out in § 1702(a)(1)(B).

Once designated, a person is placed on the Specially Designated Nationals and Blocked Persons

List maintained by the Department of the Treasury's Office of Foreign Assets Control ("OFAC").

Virtually any interaction with a designated person – including providing that person with "services

of any nature whatsoever," 31 CFR § 520.310 – can result in enforcement of IEEPA's penalties.

These include civil penalties in an amount equal to the greater of $307,922 or twice the value of a

violative transaction, and criminal penalties in the form of a fine of up to $1,000,000 and, if a

natural person, up to 20 years' imprisonment.  50 U.S.C. § 1705; 31 C.F.R. §§ 520.202, 520.310,

520.311, 520.701; 85 F.R. 19884 (2020).  Individuals and entities frequently receive substantial

penalties for violating IEEPA regulations.  In 2019 alone, OFAC imposed over $1.2 billion in civil

penalties.  Renzler Decl. Ex. 8.

The Executive Order declares a national emergency with respect to "any attempt by the

ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of

the United States, or of personnel of countries that are United States allies and who are not

parties to the Rome Statute or have not otherwise consented to ICC jurisdiction."  Executive

Order, preamble.  Section 1(a)(i) of the Order authorizes the Secretary of State to designate "any

foreign person" whom the Secretary of State, in consultation with the Secretary of the Treasury

and the Attorney General, determines:

> (A) to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States;
>
> (B) to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any personnel of a country that is an ally of the United States without the consent of that country's government;
>
> (C) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity described in subsection (a)(i)(A) or (a)(i)(B) of this section or any person whose property and interests in property are blocked pursuant to this order; or
>
> (D) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

Executive Order, § 1(a)(i).

The Executive Order imposes sanctions on persons designated under § 1(a)(i) by prohibiting "transferr[ing], pa[ying], export[ing], withdraw[ing], or otherwise deal[ing] in" such persons' "property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person." *Id*. § 1(a). The Regulations prohibit the same acts as the Executive Order. 31 C.F.R. § 520.201. Engaging in such activity is punishable by IEEPA's civil and criminal penalties. 50 U.S.C. § 1705.

The Executive Order does not define key terms that are used in the Executive Order, including: (a) "foreign person;" (b) "materially assisted;" (c) "material . . . support;" and (d) "services to or in support of." The Regulations define "material . . . support" but none of the other terms. No government agency or department has issued other regulations interpreting any of those terms. Nor has OFAC responded to a request by Plaintiff OSJI for an interpretive ruling on the meaning of key terms. Goldston Decl. ¶10.

On September 2, 2020, Secretary of State Michael Pompeo designated Ms. Bensouda and Mr. Mochochoko under § 1(a)(i) of the Executive Order. Specifically, Secretary Pompeo stated

that Ms. Bensouda was designated for "having directly engaged in an effort to investigate U.S. personnel."  Secretary Pompeo also stated that Mr. Mochochoko was separately designated for "having materially assisted Prosecutor Bensouda."  Renzler Decl., Ex. 9.

IV.    **Plaintiffs' Response to the Executive Order**

The consequence of the designations of Ms. Bensouda and Mr. Mochochoko is that Plaintiffs are subject to penalties under IEEPA if Plaintiffs interact with Ms. Bensouda or Mr. Mochochoko in a manner prohibited by the Executive Order.  Further, if Plaintiff OSJI (an U.S.-based organization that performs activities abroad) and Plaintiffs Amann, Sterio, deGuzman, and Rona (dual U.S.-citizens) are "foreign person[s]" under the Executive Order, they are also, under § 1(a)(i)(C) of the Order, themselves subject to designation if they provide material assistance, material support, or services to or in support of Ms. Bensouda or Mr. Mochochoko.

The threats of enforcement of IEEPA's civil and criminal penalties and designation under the Executive Order have caused Plaintiffs to discontinue providing education, advice, training, and other assistance to the Office of the Prosecutor, including to Ms. Bensouda or Mr. Mochochoko.  In particular:

- Plaintiff OSJI has stopped initiating or accepting meetings with Ms. Bensouda, Mr. Mochochoko, or anyone operating directly under their control or acting for them or on their behalf, and has refrained from attending any meeting where such persons are present when attendance could lead to a substantial exchange with them.  Plaintiff OSJI has refrained from taking part in meetings between civil society and the ICC when those are likely to lead to substantial interactions with Ms. Bensouda, Mr. Mochochoko, or anyone operating directly under their control or acting for them or on their behalf.  Plaintiff OSJI has also limited its participation in an ongoing ICC review process with regard to certain activities that pertain specifically to the Office of the Prosecutor, and has refrained from training civil society groups on matters related to ICC investigations in a number of countries.  Goldston Decl. ¶ 8.

- Plaintiff Amann has stopped advising Ms. Bensouda and the Office of the Prosecutor on matters related to crimes against and affecting children.  Amann Decl. ¶ 8.

- Plaintiff Sterio has abandoned plans to continue supervising student research that would otherwise be provided to the Office of the Prosecutor, including to Ms. Bensouda or Mr. Mochochoko.  She has also refrained from contacting the Office of the Prosecutor to determine supervision topics for her students, and has decided not to submit further *amicus curiae* briefs supportive of the Office of the Prosecutor to the ICC.  Sterio Decl. ¶ 8.

- Plaintiff deGuzman terminated her participation in the drafting of an *amicus curiae* brief for submission to the ICC that supports positions adopted by the Office of the Prosecutor, including Ms. Bensouda or Mr. Mochochoko.  She has also discontinued plans to present her recently published book to Office of the Prosecutor staff. deGuzman Decl. ¶ 9.

- Plaintiff Rona has decided not to submit further *amicus curiae* briefs to the ICC. Rona Decl. ¶ 7.

Plaintiffs would have performed such acts while in the United States and their speech would have been communicated to recipients in other countries via the Internet or telephonically. Goldston Decl. ¶ 9; Amann Decl. ¶ 8; Sterio Decl. ¶ 9; deGuzman Decl. ¶ 10; Rona Decl. ¶ 7.

## ARGUMENT

A plaintiff seeking a preliminary injunction must establish that: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; and (3) "the balance of equities tips in [the plaintiff's] favor, and that an injunction is in the public interest."  *Winter v. NRDC, Inc*., 555 U.S. 7, 20 (2008).  *See also Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011).  Here, all three criteria are satisfied.

### I.   Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits.  First, Defendants have violated the First Amendment by imposing content- and viewpoint-based restrictions that are not narrowly tailored to any compelling government interest.  Although the Executive Order and Regulations state they are intended to prevent the ICC from investigating U.S. personnel or the personnel of U.S. allies without their consent, the Executive Order and Regulations prohibit speech that is

unrelated to that interest.  Indeed, Plaintiffs are barred from engaging in speech that supports the ICC's efforts to investigate and prosecute crimes that the United States itself has urged the ICC to address.  Second, the Executive Order and Regulations are unconstitutionally vague under the Fifth Amendment because they do not define key terms and thus fail to specify adequately whom they cover and what they prohibit.  Third, contrary to an express exemption in IEEPA, 50 U.S.C. § 1702(b)(3), the Executive Order and Regulations regulate and prohibit the transmission of information or informational materials.

### A.   The Restrictions on Plaintiffs' Speech Violate the First Amendment

Under the First Amendment, the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  The Executive Order and Regulations, however, impose restrictions that are based on both content and viewpoint.

The restrictions are content-based because whether Plaintiffs may speak "depends on what they say."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010).  Plaintiffs may not engage in speech to Ms. Bensouda or Mr. Mochochoko that constitutes "services of any nature whatsoever."  31 C.F.R. §§ 520.202, 520.310, 520.311.  Assuming Plaintiffs are "foreign person[s]" for purposes of the Executive Order, under § 1(a)(i)(C) of the Order, they are thus forbidden from saying things to Ms. Bensouda or Mr. Mochochoko that materially assist, materially support, or serve those designated persons.  This is a quintessential content-based restriction.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.").  *See also, e.g.*, *Eclipse Enters. v. Gulotta*, 134 F.3d 63, 67 (2d Cir. 1997) (law targeting the description of heinous crimes in trading cards is content-based because it "focuses on the information contained in the trading cards").

11

The Executive Order and Regulations also restrict speech based on viewpoint. "Viewpoint discrimination is a 'subset or particular instance of the more general phenomenon of content discrimination'" in which "'the government targets not subject matter but particular views taken by speakers on a subject.'" *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 150 (2d Cir. 2004) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 831, 829 (1995)). That is exactly what Defendants have done here. They have prohibited Plaintiffs from engaging in speech that materially assists, supports, or serves Ms. Bensouda and/or Mr. Mochochoko, including in regard to investigations or prosecutions those designated persons are undertaking. The Executive Order and Regulations, however, do not prohibit speech that takes a contrary viewpoint. For instance, Plaintiffs are prohibited from submitting *amicus curiae* briefs to the ICC that support positions advanced by Ms. Bensouda and/or Mr. Mochochoko. Plaintiffs, however, are permitted to submit *amicus curiae* briefs that oppose positions advanced by Ms. Bensouda and/or Mr. Mochochoko. The restrictions thus apply not based on the *topic* of speech, but rather a person's *views* about that topic. *Ragbir v. Homan*, 923 F.3d 53, 70 (2d Cir. 2019) (vacated and remanded on other grounds, 140 S. Ct. 1959 (2020)) (executing order of removal against immigrant for engaging in speech advocating in favor of immigrants' rights is impermissibly viewpoint-based); *Travis v. Owego-Apalachin School Dist.*, 927 F.2d 688, 693-694 (2d Cir. 2011) (allowing Christmas-themed events but not pro-life events in school auditorium is impermissibly viewpoint-based).

Such content and viewpoint-based restrictions are only permitted if they can survive strict scrutiny. *Reed*, 576 U.S. at 166. This requires Defendants to "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id*. at 171 (quoting *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U. S. 721, 734 (2011)). A

law is not narrowly tailored if a less restrictive alternative would serve that interest.  *United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000).  Strict scrutiny is especially exacting for viewpoint discrimination – "an egregious form of content discrimination" that is "presumed to be unconstitutional."  *Rosenberger*, 515 U.S. at 828-29.[1]

Even assuming *arguendo* that the Executive Order and Regulations serve a compelling government interest – which they do not – the restrictions they impose are not narrowly tailored to any such interest.[2]  *First*, the Executive Order is overinclusive.  A law is overinclusive if it prohibits speech that is not part of the problem the law is meant to solve.  *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 805 (2011) (holding law restricting sale of video games to minors overinclusive with respect to the interest of "assisting concerned parents" because the law prohibited their sale to minors whose parents "think violent games are a harmless pastime"); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 122 (1991) (holding law requiring publisher of works in which author admits to committing crimes to transfer the proceeds into escrow accounts for benefit of crime victims is overinclusive with respect to the interest of compensating victims from the fruits of crime because the law "reaches a wide range of literature that does not enable a criminal to profit from his crime while a victim remains uncompensated").

The Executive Order states that it is intended to address concerns regarding the investigation or prosecution by the ICC of United States personnel and the personnel of certain

---

[1] The Regulations allow foreign persons to apply for a license to engage in otherwise prohibited speech.  31 C.F.R. § 520.201(a).  This "outright licensing" requirement is a prior restraint that, in the present circumstances, further requires strict scrutiny.  *Alexander v. United States*, 509 U.S. 544, 569 (1993); *Google LLC v. United States*, 443 F. Supp. 3d 447, 452 (S.D.N.Y. 2020).

[2] The government has the burden to identify such an interest.  *See Playboy*, 529 U.S. at 816-817.

allied countries without their consent.  Executive Order, Preamble.  The Order and Regulations, however, sweep far wider.  Section 1(a)(i)(C) prohibits the provision of material assistance and support to, and services to or in support of, Ms. Bensouda or Mr. Mochochoko of *any* kind – regardless whether that assistance, services, or support is connected to any investigative or prosecutorial effort described in the Executive Order as being of concern.

Indeed, the Order and Regulations prohibit Plaintiffs from providing such assistance even in connection with the investigation and prosecution of alleged crimes in the Democratic Republic of the Congo, the Central African Republic, Sudan, Libya, and Mali, where the U.S. has endorsed investigative and prosecutorial efforts by the ICC, and has commended others – and itself – for assisting those efforts.  *See supra* at 2-3.  The Executive Order and Regulations also forbid, *inter alia*, Plaintiff Amann from advising Ms. Bensouda regarding strategies for investigating and prosecuting crimes against and affecting children.  Plaintiff Amann is thus precluded from advising Ms. Bensouda in regard to military recruitment and use of children, child trafficking as enslavement, and torture, rape, and other forms of sexual and gender-based violence against children.  Nor may she advise Ms. Bensouda on how to protect the rights and best interests of children who interact with the Office of the Prosecutor as victims or witnesses.

The Executive Order and Regulations are therefore overinclusive.  In *Al Haramain Islamic Foundation v. Department of the Treasury*, 686 F.3d 965 (9th Cir. 2011), the Ninth Circuit considered the constitutionality of the government's designation of an entity for providing speech-based assistance – co-sponsoring events, holding demonstrations, contacting the government, organizing public education activities, and issuing press releases – to a specially designated terrorist organization that had been designated for supporting other terrorist organizations, including Al Qaeda.  The Court of Appeals held that the designation violated the

14

First Amendment because the law was not narrowly tailored to the "concededly compelling government interest of preventing terrorism." *Id*. at 997, 1001.

*Second*, the Executive Order and Regulations are underinclusive.  Laws are underinclusive where they prohibit only a subset of speech that should be prohibited for the government to achieve its articulated interest.  *See, e.g.*, *Brown*, 564 U.S. at 805; *Republican Party v. White*, 536 U.S. 765, 780 (2002).  Here, the Executive Order and Regulations restrict speech that aids or supports efforts by the ICC to investigate or prosecute crimes allegedly committed by United States personnel or personnel of U.S. allies without their consent.  But the same allegedly wrongful acts are also subject to the criminal jurisdiction of the States in which they were allegedly committed.  The Order and Regulations, however, do nothing to regulate speech that aids or supports the investigation or prosecution of such crimes by the competent domestic authorities in those countries without the consent of the United States or its allies.  The Executive Order and Regulations are therefore underinclusive.  *Brown*, 564 U.S. at 805 (holding law restricting sale of violent video games to children is underinclusive with respect to the interest of protecting children from portrayals of violence because the law did not prohibit portrayals of violence in other media); *White*, 536 U.S. at 780 (holding law prohibiting candidates for judicial office from expressing views on political issues is underinclusive with respect to the interest of preserving impartiality of judiciary because the law did not prohibit candidates from expressing such views before they became candidates or after election).

### B.  The Executive Order and Regulations Are Unconstitutionally Vague

The Executive Order and Regulations violate the Fifth Amendment's Due Process Clause because they include terms – "foreign person," "services to or in support of," "material[] assist[ance]," and "material  . . . support" – that fail to provide Plaintiffs with adequate notice as to whom is subject to the Executive Order and what activities the Executive Order proscribes.

15

The Supreme Court has emphasized that "clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253-254 (2012).  A "statute is unconstitutionally vague if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *United States v. Schulte*, 436 F. Supp. 3d 747, 752 (S.D.N.Y. 2020) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

The "degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement – depends in part on the nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498 (1982).  Where a law "is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."  *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 187 (2d Cir. 2010) (internal citations and quotations omitted); *Nichols v. Village of Pelham Manor*, 974 F. Supp. 243, 254 (S.D.N.Y. 1997) (holding ordinance was vague because it contained a phrase of "indeterminate meaning, and that indeterminacy might cause the suppression of protected speech").

In reviewing for vagueness, courts look to "the words of the ordinance itself, to the interpretations [courts have] given to analogous statutes, and . . . to the interpretation of the statute given by those charged with enforcing it."  *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).  Here, neither the Executive Order, the Regulations, nor the interpretation of analogous language by OFAC or the courts, provides the notice required by the Fifth Amendment as to who is subject to the Order or what it prohibits.

1)  The Term "Foreign Person" Is Unconstitutionally Vague

"The void-for-vagueness doctrine commands any statute to give persons of common intelligence fair notice of the persons covered [by it]." *Record Revolution No. 6 v. Parma*, 638 F.2d 916, 927 (6th Cir. 1980). *See also Lanzetta v. New Jersey*, 306 U.S. 451 (1939) (holding statute imposing criminal penalties on members of a "gang" who committed certain crimes unconstitutional because "gang" is vague). Here, the Executive Order subjects only "foreign person[s]" to designation. Thus, whether Plaintiff OSJI, an organization based in the United States that performs activities abroad, and whether Plaintiffs Amann, Sterio, deGuzman, and Rona, each a citizen of both the United States and another country, are subject to designation under the Order, depends upon the scope of "foreign person." The Order and Regulations, however, provide no definition of this inherently indeterminate term. Nor has the government issued any guidance clarifying its meaning in the context of the Executive Order.

The term "foreign person" is defined by OFAC in other sanctions regimes, such as the North Korea Sanctions Regulations ("North Korea Regulations") and the Narcotics Trafficking Sanctions Regulations ("Narcotics Regulations"). However, the definitions in those regulations provide no assistance in this case. First, OFAC has instructed that interpretations and definitions provided in specific sanctions programs do *not* apply outside those regimes because "[d]iffering foreign policy and national security circumstances may result in differing interpretations of similar language among the parts of this chapter [setting forth the different sanctions regulations]." North Korea Regulations, 31 C.F.R. § 510.101; *see also* Narcotics Regulations, 31 C.F.R. § 536.101 (same).

Second, the definitions of "foreign person" in the North Korea and Narcotics Regulations cannot clarify the term's meaning in the Executive Order because the definitions in those regulations are inconsistent. The Narcotics Regulations define a "foreign person" as:

any citizen or national of a foreign state (*including any such individual who is also a citizen or national of the United States*), or any entity *not organized solely* under the laws of the United States or *existing solely* in the United States, but does not include a foreign state.

31 C.F.R. § 536.304 (emphasis added).  In contrast, the North Korea Regulations define "foreign person" as "any person that is not a U.S. person."  31 C.F.R. § 510.310.  "U.S. person," in turn, is defined as "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."  31 C.F.R. § 510.326.

Thus, Plaintiff OSJI, which is based in the United States but also performs activities in other countries, could be subject to designation under the Narcotics Regulations' definition of "foreign person" to the extent that Plaintiff OSJI is deemed to not "exist[] solely" under the laws of the United States.[3]  But Plaintiff OSJI could not be designated under the North Korea Regulation's definition because it confines "foreign person" to persons who are *not* "U.S. persons" and Plaintiff OSJI fits the definition of a "U.S. person."

Similarly, Plaintiffs Amann, Sterio, deGuzman, and Rona could be designated under the definition of "foreign person" in the Narcotics Regulations because that definition includes persons who are a "citizen or national of a foreign state," which includes persons who are "also a citizen or national of the United States," and because those Plaintiffs are citizens of both the

---

[3] As applied to OSJI, the term "existing solely in the United States" would *itself* be unconstitutionally vague because it does not provide notification as to the meaning of "exist[ence]" outside the United States, including whether it depends on, for example, whether OSJI has offices or staff located abroad; the number of offices and/or staff members located abroad; whether OSJI has a foreign parent and/or foreign subsidiaries or affiliates; or some other factor or factors.

18

United States and a foreign country.  However, these Plaintiffs could not be designated under the North Korea Regulations' definition because it includes only persons who are *not* U.S. persons.

Indeed, the fact that "foreign person" is capable of bearing different definitions demonstrates that there is no commonly understood meaning and thus, absent clarification, the term is unconstitutionally vague.  *See, e.g.*, *Arriaga v. Mukasey*, 521 F.3d 219, 225 (2d Cir. 2008) ("Because the [Immigration and Nationality Act] does not define stalking, we accordingly measure the term by 'common understanding and practices' to determine whether it gives sufficiently definite warning of the conduct subject to deportation" to survive a vagueness challenge); *see also Doe v. Snyder*, 101 F. Supp. 3d 672, 689 (E.D. Mich. 2012) (holding the terms "regularly" and "routinely" in Michigan's Sex Offenders Registration Act are unconstitutionally vague because "the commonly accepted meaning of the terms . . . d[id] not provide sufficient guidance to law enforcement or registrants").

> 2)  The Term "Services to or in Support of" Is Unconstitutionally Vague

The Executive Order subjects foreign persons to designation for providing "services to or in support of, any activity described in subsection (a)(i)(A) or (a)(i)(B) of [the Executive Order] or any person" designated under the Order.  Executive Order, § 1(a)(i)(C).  Neither the Executive Order, nor the Regulations define "services to or in support of."   Nor has the government issued guidance explaining its meaning in the context of the Executive Order.

While OFAC has supplied non-exhaustive lists of what the term includes for purposes of other sanctions regulations, these cannot be used for the Executive Order.  *See, e.g.*, Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.101; Narcotics Regulations, 31 C.F.R. § 536.101.  Moreover, even if the lists had relevance to the Executive Order, at most, they would provide examples of what could constitute a "service *to*" a designated person under the Executive Order.  31 C.F.R. § 594.406 (providing non-exhaustive list of services that U.S.

19

persons may not provide "*to a person* whose property or interests in property are blocked

pursuant to § 594.201(a)") (emphasis added); 31 C.F.R. § 536.406 (listing services that U.S.

persons may not provide "*to a specially designated narcotics trafficker*") (emphasis added).

Plaintiffs, however, would still lack notice regarding what constitutes the provision of "services .

. . *in support of*" persons designated under the Executive Order, or "services to or in support of

*any activity*" described in subsection (a)(i)(A) or (a)(i)(B) of the Order.[4]

> 3)   The Term "Materially Assisted" Is Unconstitutionally Vague

The Executive Order permits the designation of foreign persons who have "materially

assisted" an activity described in subsection (a)(i)(A) or (a)(i)(B) or a person designated pursuant

to the Executive Order.  OFAC has not defined or provided guidance regarding the term's

meaning.  Although the same term is defined in the Venezuela Defense of Human Rights and

Civil Society Act of 2014 ("Venezuela Act"), 113 P.L. 278, 128 Stat. 3011, that definition does

not clarify its meaning in the context of the Executive Order.  The Venezuela Act defines

"materially assisted" as "the provision of assistance that is significant and of a kind directly

relevant to acts described in paragraph (1) or (2) of subsection (a)" of the statute.  *Id.* at §5(f)(6).

---

[4] In *Holder*, the Supreme Court rejected a vagueness challenge to the term "service" in 18 U.S.C. § 2339B, which prohibits the provision of material support or resources to designated foreign terrorist organizations, as applied to the plaintiffs' "independent activity."  *Holder*, 561 U.S. at 24. The Court reasoned that the statute prohibited services "to" terrorist organizations, and that services "to" a person refers only to activities coordinated with that person.  *Id*. at 23-24.  Here, however, the Executive Order more broadly prohibits the provision of services "to *or in support of*" a designated person, and not just *to* a designated person.  *Holder* also left open "exactly how much direction or coordination is necessary for an activity to constitute a 'service.'"  *Id*. at 24.  It is thus unclear whether any of Plaintiffs' acts would qualify as coordinated or independent activity.

The definition is thus necessarily tied to the Venezuela Act itself, and cannot elucidate the term's meaning in the Executive Order.

Further, because only "material" assistance – and *not* all "assistance" – permits designation under the Executive Order, and neither the Order, nor OFAC, has defined "material," the term is vague as it provides the government with unfettered discretion to decide what level of assistance meets the threshold for designation.  *See 33 Seminary LLC v. City of Binghamton*, 120 F. Supp. 3d 223, 242 (N.D.N.Y. 2015) ("[T]o survive a vagueness challenge, a rule must both provide adequate notice to those who are governed by it *and* adequately cabin the discretion of those who apply it.") (emphasis added).

4)  The Term "Material . . . Support" Is Unconstitutionally Vague

The Executive Order subjects to designation foreign persons who provide "material . . . support for" any activity described in subsection (a)(i)(A) or (a)(i)(B) of the Executive Order or any person designated pursuant to the Order.  The Regulations define the term "financial, material, or technological support," to include:

> [A]ny property, tangible or intangible, including currency, financial instruments, securities, or any other transmission of value; weapons or related materiel; chemical or biological agents; explosives; false documentation or identification; communications equipment; computers; electronic or other devices or equipment; technologies; lodging; safe houses; facilities; vehicles or other means of transportation; or goods.

31 CFR §520.304.  However, this leaves the term "material . . . support" vague as applied to Plaintiffs.  For instance, advice to the Office of the Prosecutor or *amicus* briefs submitted to the ICC could conceivably constitute "property, tangible or intangible."  But, because the non-exhaustive list of examples of "material . . . support" contained in the Regulations are unlike any of the activities Plaintiffs wish to undertake, Plaintiffs have no notice as to whether those acts could give rise to designation for providing "material . . . support."

21

The ambiguity in the term's meaning is compounded by case law holding that "material," when used in the term "material . . . support" in other contexts, means "*significant or essential.*" *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298 (3d Cir. 2004) (construing the term as used in the Immigration and Nationality Act) (emphasis added).  *See also Ayvaz v. Holder,* 564 Fed. Appx. 625, 628 (2d Cir. 2014) (remanding because "the term 'material' is ambiguous" and the Board of Immigration Appeals had "not address[ed] whether the single meal Ayvaz provided qualified as material support" so as to render him ineligible for withholding of removal).  However, in contrast to these judicial interpretations, each of the examples of "material . . . support" contained in the Regulations (*e.g.*, "weapons" and "chemical or biological agents") suggests that "material" as used in the Executive Order refers to *items* rather than to a threshold degree of "support."

Moreover, to the extent "material" in "material . . . support" could be understood as referring to a required degree of support, it is unclear how the term would mean something different than "materially assisted," which also appears in the Executive Order.  Yet, under basic "principles of statutory construction . . . each term" of a law or regulation must "be given a separate meaning."  *Kirschenbaum v. 650 Fifth Avenue*, 257 F. Supp. 3d. 463, 517 (S.D.N.Y. 2017).  Accordingly, the term "material . . . support for" must reach activity other than what is encompassed by "materially assisted."  The Executive Order and Regulations, however, leave Plaintiffs in the dark as to what that might be.

### C.  The Executive Order and Regulations Are Ultra Vires Under IEEPA

IEEPA contains an express exemption that bars the President from regulating or prohibiting, "directly or indirectly,"

> the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications,

films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.

50 U.S.C. § 1702(b)(3).

Congress intended this provision, which it enacted in 1988 as an amendment to IEEPA, "to have a broad scope" and to "prevent the executive branch from restricting the international flow of materials protected by the First Amendment." *Kalantari v. NITV, Inc*., 352 F.3d 1202, 1205 (9th Cir. 2003) (quoting H.R. Conf. Rep. No. 103-482, at 239 (1994)).  Indeed, when OFAC subsequently interpreted the provision too "narrowly and restrictively," *id*., Congress further amended the statute to clarify that the exemption applies "regardless of format or medium of transmission."  108 Stat. 382, § 525(c)(3) (1994).

The Executive Order and Regulations, however, omit any reference to the exception.  The omission is conspicuous given that the Regulations refer to a separate IEEPA exemption which prohibits the regulation of certain "personal communications."  50 U.S.C. § 1702(b)(1); 31 C.F.R. § 520.205(a).  The reference to the personal communications exception but not the information or informational materials exception carries the implication that the Executive Order and Regulations do not exempt the importation or exportation of information or informational materials, as the statute requires.  *Hardy v. New York City Health & Hosps. Corp*., 164 F.3d 789, 795 (2d Cir. 1999).  That statutory exception, however, applies to Plaintiffs' speech because it is informational in nature, exported to the Netherlands, and transmitted telephonically or via the Internet.  *TikTok v. Trump*, 2020 U.S. Dist. LEXIS 177250, *14-15 (D.D.C. Sept. 27, 2020).  As such, the restrictions on Plaintiffs' speech exceed the President's authority under IEEPA.

## II.   The Executive Order Is Causing Irreparable Harm to Plaintiffs

Courts "presume[]" irreparable harm when a plaintiff "alleges injury from a rule or regulation that directly limits speech."  *Bronx Household of Faith v. Bd. of Educ*., 331 F.3d 342,

349-50 (2d Cir. 2003). *See also N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."); *Evergreen Ass'n v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014) (finding irreparable harm solely based on the fact that the challenged law "compels Plaintiffs to make disclosures or face penalties"). As shown above, the Executive Order limits Plaintiffs' speech by subjecting them both to designation under the Order and enforcement under IEEPA, for speech based on content and viewpoint. Thus, Plaintiffs have *ipso facto* demonstrated irreparable harm.

Although they need not do so for the issuance of injunctive relief, Plaintiffs have also shown irreparable harm by "establishing an *actual* chilling effect." *Bronx Household*, 331 F.3d at 349 (emphasis added). The prospect of designation under the Executive Order or enforcement under IEPPA has caused Plaintiffs not to speak, and hence to forego exercising their First Amendment rights. *See supra* at 9-10. Enjoining Defendants from enforcing IEEPA's civil and criminal penalties against Plaintiffs, and from designating them under the Executive Order, would eliminate this chill.

### III.    The Balance of the Equities and Public Interest Favor Relief

The balance of the equities and the public interest favor an injunction. The Executive Order and Regulations violate the Constitution and IEEPA and "[t]he Government does not have an interest in the enforcement of an unconstitutional law." *Walsh*, 733 F.3d at 488 (quoting *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)). Defendants thus lack any legally cognizable interest in designating Plaintiffs or enforcing IEEPA's civil or criminal penalties against them. Moreover, injunctive relief would permit Plaintiffs to continue to provide assistance and support in regard to the investigation and prosecution of the most serious

24

of international crimes, including in relation to situations where the United States itself has endorsed the ICC as the appropriate forum.

## CONCLUSION

The Court should preliminarily enjoin Defendants from enforcing IEEPA's civil and criminal penalties against Plaintiffs and from designating them under the Executive Order.

Dated: October 9, 2020

Respectfully submitted,

**OPEN SOCIETY JUSTICE INITIATIVE, DIANE MARIE AMANN, MILENA STERIO, MARGARET DEGUZMAN and GABOR RONA**

By their attorneys,

/s/ Andrew B. Loewenstein
Andrew B. Loewenstein (*pro hac vice*)
Stephen Stich (application for admission to
    be submitted)
Ned Melanson (*pro hac vice* to be
    submitted)
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
617-832-1000
aloewenstein@foleyhoag.com
sstich@foleyhoag.com
nmelanson@foleyhoag.com

Shrutih Tewarie (SR1705)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
646-927-5500
stewarie@foleyhoag.com

(signatures continued on following page)

Nicholas M. Renzler (NR1608)
Brittan Heller (*pro hac vice* to be submitted)
FOLEY HOAG LLP
1717 K Street, NW
Washington, DC 20006
202-223-1200
nrenzler@foleyhoag.com
bheller@foleyhoag.com

*Attorneys for Plaintiffs*

26